No. 24-6605

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEREMY JAEGER, *et al.*,
*Plaintiffs-Appellees,*

v.

ZILLOW GROUP, INC., *et al.*, *et al.*,
*Defendants-Appellants.*

**On Appeal from the United States District Court for the Western District of Washington at Seattle, Case No. 2:21-cv-01551-TSZ**
**The Honorable Thomas S. Zilly**

## DEFENDANTS-APPELLANTS' OPENING BRIEF

Peter B. Morrison
*Counsel of Record*
Virginia F. Milstead
Winston P. Hsiao
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
2000 Avenue of the Stars, Suite 200N
Los Angeles, CA 90067
Telephone: (213) 687-5000
peter.morrison@skadden.com

Sean C. Knowles
Zachary E. Davison
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
sknowles@perkinscoie.com

*Attorneys for Defendants-Appellants Zillow Group, Inc., Richard N. Barton, Allen W. Parker, and Jeremy Wacksman*

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellants Zillow Group, Inc., Richard Barton, Allen Parker, and Jeremy Wacksman represent as follows: Zillow does not have a parent corporation, and no publicly held corporation owns 10% or more of Zillow stock.

DATED:  January 8, 2025                    Respectfully submitted,


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____/s/ Peter B. Morrison_____
                    Peter B. Morrison
              Attorney for Defendants-Appellants

i

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

DISCLOSURE STATEMENT....................................................................i

TABLE OF AUTHORITIES ....................................................................v

REQUEST FOR ORAL ARGUMENT ...................................................ix

INTRODUCTION...................................................................................1

STATEMENT OF JURISDICTION .......................................................3

STATEMENT OF THE ISSUES.............................................................3

STATEMENT OF THE CASE.................................................................4

I.    Factual Background .....................................................................4

      A.    Zillow Offers.....................................................................4

      B.    The Alleged Misstatements...............................................6

      C.    The Purported Corrective Disclosures..............................8

II.   The District Court Grants Class Certification Despite Defendants'
      Unrebutted Evidence Demonstrating The Lack Of Price Impact ....9

      A.    Defendants' Evidence Rebutting Price Impact .................9

      B.    Plaintiff's Price Impact Evidence...................................13

      C.    The District Court's Class Certification Order ...............16

STANDARD OF REVIEW ...................................................................17

SUMMARY OF ARGUMENT ..............................................................17

ARGUMENT .......................................................................................20

I.    Defendants Rebutted The Fraud-On-The-Market Presumption Of
      Reliance Requiring Denial Of Class Certification ...........................20

A.    *Goldman* and *Goldman II* Provide The Appropriate Standard For Assessing Whether Defendants Have Rebutted The Fraud-On-The-Market Presumption........................................................................20

    1.    Defendants May Rebut The Fraud-On-The-Market Presumption By Showing That An Alleged Misstatement Did Not Impact The Price Of The Stock At Issue ....................20

    2.    Under *Goldman*, A Defendant May Sever The Link Between A Statement And Price Impact By Showing A "Mismatch" Between Purported Corrective Disclosures And Alleged Misstatements ..........................................................................22

    3.    The Inflation Maintenance Theory Requires That Any Gap Between Front-End And Back-End Statements As Written Be Limited..................................................................................24

    4.    Loss Causation Is A Different Element Of Securities Fraud From Reliance And Imposes A More Lenient Standard Than *Goldman*'s Mismatch Standard For Rebutting The Fraud-On-The-Market Presumption Of Reliance.......................28

B.    Evidence Shows Defendants Met The *Goldman* And *Goldman II* Standard By Demonstrating A Mismatch And Therefore A Lack Of Price Impact........................................................................30

    1.    The Mismatch Between The Alleged Misstatements And The Purported Corrective Disclosures Decisively Refutes Price Impact.............................................................................30

        a.    The Purported Corrective Disclosures Did Not Correct Any Alleged Misstatement....................................31

        b.    The October 4, October 31, And November 2 Purported Corrective Disclosures Did Not Disclose Any New Information Related To The Alleged Misstatements ................................................................34

        c.    Information In The Purported Corrective Disclosures Was Not Value-Relevant...............................38

2.      A Good Dose Of Common Sense Refutes Any Price Impact ........................................................................43

II.    The District Court Committed Multiple Legal Errors In Certifying A Class .............................................................................................45

    A.     The District Court Erroneously Applied The Loss Causation Plausibility Standard Instead Of The *Goldman* Mismatch Standard........46

    B.     The District Court Erroneously Failed To Take Into Account All Record Evidence Relevant To Price Impact .........................................52

CONCLUSION.......................................................................................57

CERTIFICATE OF COMPLIANCE......................................................58

iv

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Amgen Inc. v. Connecticut Retirement Plan & Trust Funds,*
568 U.S. 455 (2013) ....................................................................10, 20, 57

*In re Apple Inc. Securities Litigation,*
No. 4:19-cv-2033-YGR,
2022 WL 354785 (N.D. Cal. Feb. 4, 2022) .................................. 50

*Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.,*
77 F.4th 74 (2d Cir. 2023) ...................................................... 1, 2, 17, 18, 19,
....................................................................21, 24, 25, 27, 29, 30,
.................................................... 31, 32, 34, 38, 42, 43, 51, 53

*B.K. ex rel. Tinsley v. Snyder,*
922 F.3d 957 (9th Cir. 2019) .................................................17, 51, 57

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988) ................................................................ 20, 21

*Beam v. Colvin,*
43 F. Supp. 3d 1163 (W.D. Wash. 2014), *amended,*
2014 WL 5111192 (W.D. Wash. Oct. 10, 2014) ................................. 15, 35

*In re BofI Holding, Inc. Securities Litigation,*
977 F.3d 781 (9th Cir. 2020) ........................................................28, 46, 47

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013) ................................................................ 52

*Connecticut Retirement Plans & Trust Funds v. Amgen Inc.,*
660 F.3d 1170 (9th Cir. 2011), *aff'd,* 568 U.S. 455 (2013) .................................... 34, 48

*Daniels v. Davis,*
No. 10-05316 RBL,
2010 WL 5185449 (W.D. Wash. Dec. 17, 2010)........................................ 15

*Dura Pharmaceuticals, Inc. v. Broudo,*
544 U.S. 336 (2005) ................................................................22, 28

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ...................................................... 30

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) .......................................................29, 47, 48

*Espy v. J2 Global, Inc.*,
99 F.4th 527 (9th Cir. 2024) ...................................................... 28

*Ferris v. Wynn Resorts Ltd.*,
No. 2:18-cv-00479-APG-DJA,
2023 WL 2337364 (D. Nev. Mar. 1, 2023) ................................... 22

*In re FibroGen Securities Litigation*,
No. 21-cv-02623-EMCC,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) ........................ 31, 38

*In re Genius Brands International, Inc. Securities Litigation*,
97 F.4th 1171 (9th Cir. 2024) ............................................... 46, 49

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
594 U.S. 113 (2021) ................................................ 1, 2, 10, 18, 19,
.................................................................... 21, 22, 23, 24, 27,
.......................................................33, 39, 43, 52, 53, 57

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ............................................. 10, 20, 21, 48, 52

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016) ............................................... 22, 37

*In re Kirkland Lake Gold Ltd. Securities Litigation*,
No. 20-cv-4953 (JPO),
2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ........................ 30, 38

*Maldonado v. Morales*,
556 F.3d 1037 (9th Cir. 2009) ...................................................... 15

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ........................................ 29, 46, 48, 50

*Pardi v. Tricida, Inc.*,
No. 21-cv-00076-HSG,
2024 WL 4336627 (N.D. Cal. Sept. 27, 2024)................... 18, 30, 35, 38, 49

*Pearlstein v. BlackBerry Ltd.*,
  No. 13 Civ. 7060 (CM),
  2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ................................................ 50

*Pelletier v. Endo International PLC*,
  338 F.R.D. 446 (E.D. Pa. 2021) ................................................................. 33

*In re Qualcomm Inc. Securities Litigation*,
  No. 17cv121-JO-MSB,
  2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ....................................... 35, 43

*Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*,
  No. 18-CV-12084 (VSB) (KHP),
  2024 WL 1497110 (S.D.N.Y. Apr. 5, 2024) ................................................ 31

*In re Village at Lakeridge, LLC*,
  814 F.3d 993 (9th Cir. 2016), *aff'd*, 583 U.S. 387 (2018) ........................... 17

*In re Vivendi S.A. Securities Litigation*,
  838 F.3d 223 (2d Cir. 2016) .................................................... 23, 24, 25, 31

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) .........................................................24, 25, 31

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ..................................................................................... 52

*White v. Symetra Assigned Benefits Service Co.*,
  104 F.4th 1182 (9th Cir. 2024) .................................................................. 17

## STATUTES

15 U.S.C. § 78aa .................................................................................................. 3

15 U.S.C. § 78j .................................................................................................... 3

15 U.S.C. § 78t .................................................................................................... 3

28 U.S.C. § 1292 ................................................................................................. 3

28 U.S.C. § 1331 ................................................................................................. 3

## **REGULATIONS**

17 C.F.R. § 240.10b-5..................................................................... 3

## **RULES**

Fed. R. App. P. 34(a)..................................................................... ix

Fed. R. Civ. P 23(f)........................................................................ 3

## <u>REQUEST FOR ORAL ARGUMENT</u>

In accordance with Rule 34(a) of the Federal Rules of Appellate Procedure, Defendants-Appellants respectfully request oral argument. This appeal involves important legal issues that Defendants-Appellants believe the District Court incorrectly resolved, and oral argument would substantially aid the Court in its resolution of this case.

## INTRODUCTION

The Supreme Court in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System* ("*Goldman*"), explained that a defendant in a securities litigation proceeding under a so-called inflation-maintenance theory, like here, may rebut the presumption of reliance that plaintiffs typically invoke by showing a "mismatch between the contents of the misrepresentation and the corrective disclosure." 594 U.S. 113, 123 (2021). In considering the *Goldman* decision on remand, the Second Circuit, in *Goldman II*, elaborated that in determining whether such a "mismatch" exists, courts should examine whether the corrective statements "*expressly and specifically negat[e]*" the misrepresentation or "*directly render[]*" it false. *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*Goldman II*"), 77 F.4th 74, 98-99 (2d Cir. 2023).[1] Whether a presumption of reliance applies is critical because, as the *Goldman* Court explained, without the presumption of reliance, "individualized issues of reliance ordinarily would defeat predominance and preclude certification of a securities fraud class action." *Goldman*, 594 U.S. at 119.

Appellants Zillow Group, Inc. ("Zillow" or the "Company"), Richard Barton, Allen Parker, and Jeremy Wacksman (collectively, "Defendants") demonstrated to the District Court this very "mismatch between the contents of the misrepresentation and

---

[1] Unless otherwise noted, internal quotations, citations, and alterations are omitted, and emphases are added.

1

the corrective disclosure" sufficient to rebut the presumption of reliance and to defeat class certification. Indeed, **none** of the purported corrective disclosures even mentioned the alleged misstatements.

The District Court, however, did not apply the "mismatch" standard under *Goldman* and *Goldman II*. Instead, the District Court incorrectly applied the far more forgiving plausibility standard for demonstrating loss causation. The District Court did so notwithstanding that *Goldman II* expressly explained that whether a defendant has rebutted the presumption of reliance "is a different question than loss causation," and that "in light of *Goldman*," the former requires a "closer fit" than the latter. *Goldman II*, 77 F.4th at 99 n.11. This was reversible error.

The District Court exacerbated its error by refusing to consider Defendants' evidence of mismatch. The *Goldman* Court expressly directed lower courts to "take into account *all* record evidence" regardless of whether that evidence "overlaps with materiality or any other merits issue." *Goldman*, 594 U.S. at 124 (emphasis in original). But the District Court explicitly **refused** to consider Defendants' evidence on the basis that it "goes to loss causation and the merits." 1-ER-16. This too was reversible error.

The Ninth Circuit has not addressed *Goldman*, leaving district courts without guidance on how to interpret and apply it. This case presents an opportunity for the Court to fill that gap and address for the first time the standards announced in *Goldman* and *Goldman II* and, in doing so, correct the District Court's erroneous decision below. This Court should reverse the District Court's decision, and, because Defendants by a

preponderance of the evidence in the record demonstrated that the alleged misrepresentations did not impact Zillow's stock price, remand with instructions to decertify the class. At a minimum, the Court should vacate the District Court's decision and remand with instructions to apply the standards set forth in *Goldman* and *Goldman II*.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 15 U.S.C. § 78aa and 28 U.S.C. § 1331, because Plaintiff's claims arise under the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

This Court has jurisdiction under 28 U.S.C. § 1292(e) and Rule 23(f) of the Federal Rules of Civil Procedure.

This appeal is timely. On August 23, 2024, the District Court granted Plaintiff's motion for class certification. On September 6, 2024, Defendants timely petitioned under Rule 23(f) for permission to appeal from the District Court's order. On October 24, 2024, this Court granted the petition.

## STATEMENT OF THE ISSUES

**1.** Whether the District Court clearly erred in failing to conclude that Defendants rebutted the fraud-on-the-market presumption by a preponderance of the evidence.

3

**2.** Whether the District Court erred by substituting the plausibility standard for loss causation for the proper standard for assessing whether, under *Goldman*, a defendant has shown a lack of price impact sufficient to rebut the fraud-on-the-market presumption of reliance due to a "mismatch" between the alleged misstatements arguably causing price inflation and the purported corrective disclosures removing such inflation.

**3.** Whether the District Court erred by failing, in contravention of *Goldman*, to "take into account *all* record evidence relevant to price impact, regardless of whether that evidence overlaps with materiality or any other merits issue," in assessing whether Defendants rebutted the fraud-on-the-market presumption.

## STATEMENT OF THE CASE

## I.  FACTUAL BACKGROUND

### A.  Zillow Offers

In April 2018, Zillow launched Zillow Offers ("ZO"), its "iBuying" business, in which Zillow purchased homes directly from sellers, performed renovations, and re-sold the homes for small profit margins. 5-ER-913-14. From its start, Zillow consistently disclosed ZO was part of the Company's vision to become a one-stop shop for residential real estate transactions services, i.e. "Zillow 2.0." 3-ER-303-04, 5-ER-927-28. Consequently, Zillow prioritized scaling ZO in order to become a market maker, rather than making large profits on each home. 3-ER-311. Because too much

4

profit would cause customers to go elsewhere for better deals, Zillow sought less profit and more scale so it could meet the customers' needs as a service business. *Id.*

In late 2020 or early 2021, the real estate market experienced unprecedented growth in home price appreciation ("HPA"). 3-ER-307, 5-ER-917-21. Zillow's forecasting was not keeping up with the market, so Zillow was (i) making a greater profit on the homes it bought and sold than intended, and (ii) acquiring fewer homes than it needed to scale. 5-ER-917-21.

In March or April 2021, Zillow launched a set of initiatives to catch up to its acquisition and profit margin goals, known internally as "Project Ketchup." 5-ER-939-40. As early as its May 4, 2021 earnings call, Zillow disclosed the substance and aims of Project Ketchup (although not the name itself), including: (i) improving pricing by adjusting Zillow's pricing methodology to keep pace with growth in HPA and to make its offers more competitive (i.e. offering more for homes); and (ii) reducing the scope and cost of after-purchase renovation projects, with savings passed on to the home seller. 5-ER-915, 5-ER-918, 5-ER-921, 5-ER-923.

As discussed below, during its August 5, 2021 quarterly earnings call and the September 13, 2021 Piper Sandler 2021 Virtual Global Technology Conference, Zillow spoke further on these initiatives. 5-ER-964-65, 5-ER-969-70.

In the summer of 2021, HPA suddenly and precipitously slowed. 3-ER-361. Zillow's earlier adjustments to pricing began to overshoot, resulting in purchase prices above later resale prices. 3-ER-354, 3-ER-356, 3-ER-361. Ultimately, on its November

5

2, 2021 quarterly earnings call, Zillow announced it was (i) writing down over $500 million in home inventory; and (ii) winding down ZO, because the housing market was too volatile for Zillow's pricing projections, and the potential losses moving forward could jeopardize its entire business. 3-ER-353-54.

## B.     The Alleged Misstatements

Upon the announcement of the ZO wind-down, the market reacted to the news Zillow was ending a business segment, and this lawsuit followed. Plaintiff alleges Defendants made misstatements on (i) August 5, 2021, in Zillow's Q2 2021 shareholder letter and earnings call; and (ii) September 13, 2021, during the Piper Sandler Conference. 5-ER-964-66, 5-ER-969-971.[2] These alleged misstatements fall into two categories.

*First*, Plaintiff alleges Defendants made general, positive statements concerning its pricing models, including: "The record number of homes purchased was more than double that of Q1 2021 and is a direct reflection of the customer value proposition, the progress we have made in strengthening our pricing models and automation when providing offers to customers." 5-ER-964. Plaintiff also challenges the statement: "We made progress this quarter in improving our pricing models, including launching the

---

[2] After class certification briefing was complete, Plaintiff filed a First Amended Class Action Complaint, in which he alleged Defendants made additional misstatements on October 18, 2021, specifically, in Zillow's announcement it was pausing acquisitions. 1-ER-2. The October 18 statements played no role in the District Court's analysis, *id.*, so any discussion of it is omitted here.

6

neural Zestimate, which sharpened our offer strength," and "[t]hese improvements drove rapid gains in conversion rates in Q2 when compared to Q1, resulting in record purchases, more than catching up to our pre-pandemic pace." 5-ER-965. Plaintiff alleges Defendants made further misstatements in attributing that inventory growth to consumer demand, including there was "strong customer interest in ZO…at the beginning of Q2," which "continued to accelerate" throughout the quarter. 5-ER-964-65.

Importantly, in challenging these statements, Plaintiff does not dispute that Zillow *disclosed* it was adjusting its pricing methodologies to increase offer prices so that the offers became more competitive and would result in more acquisitions. Rather, Plaintiff alleges Zillow failed to adequately disclose *how* it was adjusting its offer prices. Specifically, Plaintiff claims that while Zillow stated its increase in acquisitions was due to improvements to its pricing model and organic consumer demand, Zillow allegedly concealed that it had also manually applied what it called "gross pricing overlay[s]" ("overlays") to offer prices, and that these overlays were what created demand. 5-ER-966-68. Although Zillow had made clear publicly that ZO was increasing its offer prices to keep up with unprecedented HPA, 3-ER-305; 3-ER-307, according to Plaintiff, the way Zillow did so—using overlays—did not constitute strengthening its pricing models, 5-ER-966-71. Because Zillow did not explicitly disclose its use of overlays, Zillow's stock allegedly remained at an inflated price. 5-ER-978. According to Plaintiff, had Zillow explicitly disclosed its use of overlays, the inflation would have been removed

7

from the stock, and the stock price would have dropped when the statements were made. 5-ER-979.

*Second*, Plaintiff alleges Zillow made misstatements regarding the durability of unspecified operational, unit economic, and/or renovation process improvements. 5-ER-966-69. In particular, Plaintiff alleges that Zillow's statement that "the 353 basis point improvement from a year ago in renovation, holding and selling costs, were largely durable operational improvements" was misleading. 5-ER-966. Plaintiff claims Zillow concealed that the operational improvements were driven by reducing the scope and pay of renovation projects, which caused contractors to "deprioritiz[e]" Zillow or "declin[e] jobs altogether." 5-ER-967-68. The alleged misstatements purportedly maintained an inflated price for Zillow stock because Zillow failed to disclose its reduction in renovation scope and pay and that contractors declined Zillow jobs. 5-ER-968-69, 5-ER-978. Had Zillow disclosed the reduced renovation scope and contractor reaction, Plaintiff contends, the inflation would have been removed from the stock, and the stock price would have dropped when the statements were made. 5-ER-979.

## C. The Purported Corrective Disclosures

Plaintiff alleges the "truth" was revealed through four purported "corrective disclosures," none of which disclosed the information Plaintiff claims made Defendants' earlier statements false or misleading, namely, the use of overlays, reductions in renovations scope, and contactors' "deprioritizing" Zillow renovation jobs:

8

- On October 4, 2021, RBC Capital Markets ("RBC") issued a report stating that, based on a review of public real estate listings, Zillow appeared to have too much inventory it bought "at too high a price." 5-ER-980; *see also* 3-ER-368.

- On October 17, 2021, Bloomberg reported ZO was pausing new home acquisitions, a fact Zillow confirmed on October 18, 2021, in a press release, explaining the pause was due to a "backlog in renovations and operational capacity constraints" with respect to its existing inventory. 5-ER-980-81; *see also* 3-ER-382, 3-ER-385.

- On October 31, 2021, KeyBanc Capital Markets ("KeyBanc") issued a report stating that 66% of Zillow's homes were for sale below their purchase price. 5-ER-983; *see also* 3-ER-413. "Across the entire sample set," KeyBanc reported, "the value weighted pricing was a 2.0% discount vs. purchase price." 3-ER-414. News outlets repeated KeyBanc's report on November 1, 2021, and Bloomberg reported that Zillow planned to divest approximately 7,000 homes for approximately $2.8 billion to private investors. 5-ER-983; *see also* 3-ER-388, 3-ER-525.

- On its November 2, 2021 earnings call, Zillow announced it was (i) writing down over $500 million in home inventory; and (ii) winding down ZO, because it determined that the housing market was too volatile for Zillow's pricing projections, and that the potential losses moving forward could jeopardize the entire business. 5-ER-984-86; *see also* 3-ER-353-54.

## II. THE DISTRICT COURT GRANTS CLASS CERTIFICATION DESPITE DEFENDANTS' UNREBUTTED EVIDENCE DEMONSTRATING THE LACK OF PRICE IMPACT

On March 14, 2024, Plaintiff moved to certify a class of all investors who acquired Zillow stock during the period from August 5, 2021, to November 2, 2021. 5-ER-877. In doing so, Plaintiff invoked the fraud-on-the-market presumption of reliance. 5-ER-884. Defendants, in turn, submitted extensive evidence that rebutted that presumption.

### A. Defendants' Evidence Rebutting Price Impact

The so-called fraud-on-the-market presumption of reliance posits that, if a company whose stock trades in an efficient market makes an alleged material

misstatement, the price of that stock theoretically will incorporate that alleged material misstatement by inflating the price of that stock. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462 (2013). Thus, when plaintiffs buy the stock at the allegedly inflated price, the court presumes that they have relied on the alleged misstatement. *Id.* However, defendants may rebut the presumption if they "show that the alleged misrepresentation did not, for whatever reason, actually affect the market price." *Halliburton Co. v. Erica P. John Fund, Inc.* (*"Halliburton II"*), 573 U.S. 258, 269 (2014). "If a misrepresentation had no price impact," then the presumption does not apply. *Goldman*, 594 U.S. at 119. A "mismatch" between the content of the "front-end" alleged misstatements and the "back-end" purportedly corrective statements undermines price impact. *Id.*

In their April 26, 2024 opposition to class certification, Defendants demonstrated a mismatch and lack of price impact caused by the alleged misstatements in the complaint. 3-ER-562-75. In support of their argument, Defendants submitted an expert report by Dr. Faten Sabry, who has over twenty-five years of experience performing economic analyses of class certification, liability, materiality, and damages. 2-ER-167. Her opinions and the record evidence upon which she relied are summarized below.

**Opinion 1.** Dr. Sabry opined that the alleged "front-end" misstatements on August 5 and September 13, 2021, had no price impact at the time they were made, i.e., no "front-end" price impact. 2-ER-182-83. While one would ordinarily expect that a

material misstatement would cause an artificial increase in the price of the stock, here, Dr. Sabry found the stock price either declined or was not impacted following the alleged misstatements. *Id.*

At the outset, Dr. Sabry found Zillow made public statements with virtually identical content on May 4 and June 15, 2021—before the class period—and neither date was followed by a statistically significant positive price reaction. 2-ER-196-201. In fact, the price ***decreased*** after the May 4, 2021 statements. 2-ER-198-99. Had the information in the alleged misstatements impacted Zillow's stock price, then one would have expected Zillow's stock price to react differently to these earlier disclosures with the same information.

Unsurprisingly, therefore, regarding the stock price reaction to the alleged misstatements on August 5, 2021, Dr. Sabry found ***no statistically significant price increase***. 2-ER-201. Rather, as with the May 4, 2021 statements, there was a statistically significant price ***decrease***. 2-ER-201-02 (citing Nye Rep.). Dr. Sabry also found that a majority of equity analyst reports lowered their valuations of Zillow stock, with some expressing concerns about Zillow's ability to expand its iBuying business. 2-ER-202-03. Had the alleged misstatements actually deceived the market into believing Zillow stock was more valuable than it was, one would expect analysts to increase their valuations, not lower them, and certainly not to express concern about the business. Regarding the stock price reaction to the alleged misstatements on September 13, 2021, Dr. Sabry found that most of the stock price increase that day took place before Zillow's

conference presentation even began. Thus, the slight increase following the presentation was not statistically significant. 2-ER-207.

*Opinion 2.* Dr. Sabry next opined that the four purported "back-end" corrective disclosures had no price impact attributable to the misstatements, i.e., no "back-end" price impact. 2-ER-183-86.

As an initial, essential finding, Dr. Sabry explained that **none of the four statements addressed or revealed the allegedly omitted information from the alleged misstatements**, namely, Zillow's use of overlays or its reduction in renovation scope and pay causing contractors to deprioritize Zillow jobs. 2-ER-209, 2-ER-212-13, 2-ER-217, 2-ER-224-25. Thus, there is a stark "mismatch" between front-end and back-end statements under the standards of *Goldman* and *Goldman II*, invalidating the presumption.

Further, with respect to the October 4, 2021 RBC report about Zillow's inventory in Phoenix, Dr. Sabry found it (i) was not followed by a statistically significant negative stock price reaction; (ii) was based on publicly available data; (iii) itself concluded Zillow's overpaying for houses in Phoenix should not "matter that much"; and (iv) was not discussed in the market. 2-ER-209-11.

Next, with respect to the October 17-18, 2021 disclosures about Zillow's acquisitions pause, Dr. Sabry found (i) the decision to pause due to labor supply issues was consistent with macroeconomic conditions at the time; and (ii) equity analysts did

12

not attribute the pause to the use of overlays or reductions in renovations scope and pay. 2-ER-213-16.

Regarding the October 31, 2021 KeyBanc analysis and November 1, 2021 Bloomberg article, Dr. Sabry found (i) no less than seven analyst reports between October 19 and October 29 discussed the same information, and in no instance did a statistically significant negative stock price reaction follow; and (ii) equity analysts did not attribute the results of the KeyBanc analysis or Bloomberg article to Zillow's use of overlays or reductions in renovations scope and pay. 2-ER-218-23.

Lastly, with respect to the November 2, 2021 disclosure, Dr. Sabry found (i) no equity analyst attributed the inventory impairment or wind-down to Zillow's use of overlays or reductions in renovations scope and pay; (ii) it was consistent with earlier disclosures of losses; and (iii) it was a realization of previously disclosed risks. 2-ER-225-32.

Moreover, Dr. Sabry showed that Zillow's use of overlays and reduction in renovations scope (and the alleged contractor reaction to the reductions) was first disclosed in a November 9, 2021 *Business Insider* article and November 17, 2021 *Wall Street Journal* article—both after the class period—but that Zillow's stock price had *no statistically significant price reaction* following publication of these articles. 2-ER-232-35.

## B. Plaintiff's Price Impact Evidence

In response to Dr. Sabry's report, Plaintiff presented a rebuttal report from Dr. Nye. 2-ER-47. (Because it was submitted with Plaintiff's reply, Defendants have not

previously had an opportunity to respond to its assertions.) In the rebuttal report, Dr. Nye relied on his understanding of the legal requirements for demonstrating a "corrective disclosure" under the loss causation standard—which, as discussed below, the *Goldman II* court *expressly rejected* for purposes of assessing whether a defendant has shown a mismatch sufficient to rebut the fraud-on-the-market presumption. Using this incorrect standard, Dr. Nye opined that Dr. Sabry "adopted an incorrect and overly narrow interpretation of Plaintiff's allegations" because she did not credit Plaintiff's loss causation allegations and instead examined whether the alleged corrective disclosures revealed the information Plaintiff alleges was misleadingly concealed—the use of pricing overlays and the reductions in renovation scope. 2-ER-52, 2-ER-55-61, 2-ER-74, 2-ER-81, 2-ER-87-89, 2-ER-107-08 (citing loss causation law, discussing Plaintiff's allegations that the events disclosed in the alleged corrective disclosures were the "direct, proximate, and foreseeable result" of the use of overlays and reduced scope of renovations, and arguing that Dr. Sabry's analysis was "inconsistent with and seek[s] to rebut Plaintiff's allegations regarding loss causation").

With respect to the alleged misstatements on August 5 and September 13, 2021, Dr. Nye opined that under an inflation maintenance theory, the absence of a statistically significant stock price increase "is inconclusive with respect to price impact." 2-ER-62.

14

With respect to the purported corrective disclosures, Dr. Nye first expressly declined to address the October 4, 2021 RBC report. 2-ER-52.[3] As for the remaining three purported disclosures, Dr. Nye opined that Dr. Sabry failed to demonstrate a lack of price impact because the October 17-18 disclosures, the October 31-November 1 disclosures, and the November 2 disclosure were followed by statistically significant negative stock price reactions. 2-ER-70, 2-ER-84, 2-ER-102. However, Dr. Nye merely showed that news outlets attributed the stock price declines to the alleged *corrective disclosures themselves*. 2-ER-70-72, 2-ER-84-85, 2-ER-102-04. Stock prices often decline in response to negative news—this is expected. Such declines say nothing whatsoever about whether the negative news actually revealed information that was previously concealed or misstated—in other words, whether a match exists—which is the relevant inquiry for assessing price impact. Dr. Nye provided no analysis himself connecting the negative news to the allegedly concealed information that forms the basis of Plaintiff's claims. Thus, Dr. Nye did not even attempt to show why the evidence satisfied the proper *Goldman* "mismatch" standard, as opposed to the improper, and more forgiving, loss causation standard.

---

[3] Plaintiff, in his reply brief, did not respond to Defendants' arguments as to the report. *See* 2-ER-32. "Arguments not made in response are conceded." *Daniels v. Davis*, 2010 WL 5185449, at *4 (W.D. Wash. Dec. 17, 2010) (citing *Maldonado v. Morales*, 556 F.3d 1037, 1048 n. 4 (9th Cir. 2009)). Plaintiff has thus "concede[d]" a lack of price impact as to the October 4, 2021 RBC report. *See Beam v. Colvin*, 43 F. Supp. 3d 1163, 1170 (W.D. Wash. 2014) *amended*, 2014 WL 5111192 (W.D. Wash. Oct. 10, 2014).

### C.    The District Court's Class Certification Order

On August 23, 2024, the District Court granted Plaintiff's motion and certified a class of investors who acquired Zillow common stock between August 5, 2021 and November 2, 2021. 1-ER-19-21. In doing so, the District Court found Plaintiff satisfied Rule 23(a)'s requirements of numerosity, commonality, adequacy, and typicality, as well as Rule 23(b)(3)'s requirements of superiority and predominance. 1-ER-7-19.

In reaching its conclusion on predominance, the District Court discussed whether Defendants had rebutted the fraud-on-the-market presumption, specifically, whether Defendants had proven a lack of price impact. 1-ER-14. However, rather than apply *Goldman* or *Goldman II*'s mismatch standard, the District Court improperly applied a loss causation standard. Because the District Court applied the wrong standard, it also ignored the evidence in the record proving a mismatch between the alleged misstatements and purported corrective disclosures. Despite 131 pages of evidence in Dr. Sabry's report, the District Court's discussion centered on the allegations in Plaintiff's complaint, which the court accepted as true. 1-ER-16-18 (repeatedly noting what "Jaeger allege[d]" and crediting allegations "[a]ccording to Jaeger").

In fact, the District Court mentioned only three pieces of evidence in its discussion: Dr. Sabry's finding that equity analysts wrote about the October 17-18 disclosures, 1-ER-16; Dr. Nye's finding that multiple commentators discussed the October 31 KeyBanc report in the weeks following its publication, 1-ER-18; and Dr.

16

Sabry's acknowledgment that a statistically significant stock price reaction occurred on November 1-2, 1-ER-18. Moreover, the District Court expressly declined to consider certain evidence demonstrating a lack of price impact, incorrectly finding it went "to loss causation and the merits of Jaeger's…claims." 1-ER-16.

## STANDARD OF REVIEW

This Court reviews a district court's grant of class certification for abuse of discretion. *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1191 (9th Cir. 2024). Under this standard, it reviews a district court's "class certification determination for legal error under a de novo standard," *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 965 (9th Cir. 2019) ("An error of law is a per se abuse of discretion."), and a district court's findings of fact "under the clearly erroneous standard," *id.* at 965-66. "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Vill. at Lakeridge, LLC*, 814 F.3d 993, 1002 (9th Cir. 2016), *aff'd*, 583 U.S. 387 (2018); *see also Goldman II*, 77 F.4th at 95 (applying clear error standard to district court's conclusion as to whether the predominance of the evidence rebutted a finding of price impact).

## SUMMARY OF ARGUMENT

***First***, *Goldman* and *Goldman II* hold that, in a securities litigation proceeding under an inflation maintenance theory, courts should examine whether Defendants have shown a mismatch between the contents of the alleged misrepresentations and the

17

corrective disclosures sufficient to show a lack of price impact, thereby rebutting the fraud-on-the-market presumption of reliance. *Goldman*, 594 U.S. at 119; *Goldman II*, 77 F.4th at 97. Defendants have done so here, demonstrating a mismatch by a preponderance of the evidence, and rebutting the presumption of reliance. None of the purported corrective disclosures Plaintiff alleges disclosed the information that Plaintiff claims was concealed—neither the use of overlays, nor reductions in renovation scope causing contractors to deprioritize Zillow jobs. Rather, the alleged corrective disclosures merely repeated information already known to the market and/or were not "value-relevant," i.e., did not cause "at least some of the stock price decline." *Pardi v. Tricida, Inc.*, 2024 WL 4336627, at *7 (N.D. Cal. Sept. 27, 2024). Thus, because there is a mismatch between the contents of the alleged misrepresentations and the corrective disclosures, Defendants have shown a lack of price impact and rebutted the presumption of reliance. Consequently, individualized issues of reliance defeat predominance, precluding class certification. *Goldman*, 594 U.S. at 119.

***Second***, rather than apply *Goldman*'s "mismatch" standard, the District Court improperly applied the more forgiving loss causation standard to evaluate whether the alleged disclosures impacted the price of Zillow stock sufficient to invoke the fraud-on-the-market presumption of reliance. 1-ER-15-19. But as the Second Circuit—the only appellate court to consider the question—noted, whether a defendant has sufficiently shown a mismatch to rebut the fraud-on-the-market presumption "is a different question than loss causation." *Goldman II*, 77 F.4th at 99 n.11. "[I]n light of [the Supreme

18

Court's decision in] *Goldman*," the mismatch standard requires a "closer fit" between the information in a corrective disclosure and the information alleged to be misleading than a loss causation standard. *Id.* Because it applied the wrong standard, the District Court incorrectly concluded Defendants failed to rebut the fraud-on-the-market presumption. This legal error contradicts clear precedent from the Supreme Court, *Goldman*, 594 U.S. at 123-24, as explained by the Second Circuit, *Goldman II*, 77 F.4th at 99 n.11.

***Third***, the Supreme Court in *Goldman* also held that in applying a mismatch standard and assessing price impact, a court must consider all evidence of price impact, even if such evidence overlaps with the merits. *Goldman*, 594 U.S. at 124. Here, the District Court explicitly declined to evaluate evidence Defendants submitted demonstrating a lack of price impact, including expert analyses and market data, under the incorrect view that such evidence should be reserved for merits-stage proceedings. 1-ER-16. Indeed, the District Court in its Order expressly refused to consider evidence on the basis that it "goes to loss causation and the merits of Jaeger's…claims, and…does not preclude class certification." *Id.* By refusing to engage with all of Defendants' evidence, the District Court ignored the Supreme Court's directive to weigh all probative evidence in assessing price impact regardless of whether it relates to a merits issue. This too requires reversal.

## ARGUMENT

**I. DEFENDANTS REBUTTED THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE REQUIRING DENIAL OF CLASS CERTIFICATION**

**A.** ***Goldman* and *Goldman II* Provide The Appropriate Standard For Assessing Whether Defendants Have Rebutted The Fraud-On-The-Market Presumption**

**1. Defendants May Rebut The Fraud-On-The-Market Presumption By Showing That An Alleged Misstatement Did Not Impact The Price Of The Stock At Issue**

Plaintiffs seeking to certify claims asserted under Section 10(b) of the Exchange Act must show, among other things, that they relied on alleged misstatements in a common manner in deciding to sell or purchase a security. *See Halliburton II*, 573 U.S. at 267. To meet this burden, plaintiffs often invoke the "fraud-on-the-market" or "*Basic*" presumption of reliance. *See Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988). This doctrine creates a presumption that plaintiffs relied on the alleged misstatements so long as, among other things, the stock at issue trades in an efficient market. *Halliburton II*, 573 U.S. at 268. According to the theory, "the market price of shares traded on well-developed markets"—known as efficient markets—"reflects all publicly available information, and, hence, any material misrepresentations." *Id.* If a company whose stock trades in an efficient market makes an alleged material misstatement, the price of that stock theoretically will incorporate that alleged material misstatement by inflating the price of that stock. *See Amgen*, 568 U.S. at 462. Thus, when plaintiffs buy the stock

20

at the allegedly inflated price, the court presumes that they have relied on the alleged misstatement. *Id.*

As the Court in *Basic* recognized, a defendant can rebut the presumption with "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248. In *Halliburton II*, the Court held that defendants may rebut the fraud-on-the-market presumption if they "could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price." *Halliburton II*, 573 U.S. at 269. "If a misrepresentation had no price impact, then *Basic*'s fundamental premise 'completely collapses, rendering class certification inappropriate.'" *Goldman II*, 594 U.S. at 119.

Defendants may "defeat the *Basic* presumption at [the class certification] stage through direct as well as indirect price impact evidence." *Halliburton II*, 573 U.S. at 283. Examples of direct evidence include event studies measuring the impact of purported misstatement on the stock price. S*ee id.* at 280-81. Examples of indirect evidence include "market commentary," such as whether "the media, market participants, [or] the defendants themselves immediately made the connection between the revelations and the allegations." *Goldman II*, 77 F.4th at 102 n.14, 104.

21

**2. Under *Goldman*, A Defendant May Sever The Link Between A Statement And Price Impact By Showing A "Mismatch" Between Purported Corrective Disclosures And Alleged Misstatements**

In *Goldman*, the Supreme Court for the first time considered the fraud-on-the-market presumption in an "inflation maintenance" case. In a typical fraud-on-the-market case, plaintiffs allege that a defendant made a positive, but allegedly misleading, material statement to the market, and that the price of the defendant's stock increased in response, causing the stock price to become "artificially inflated." *See, e.g., Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 339-41 (2005); *see also IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 779 (8th Cir. 2016) (discussing expert report invoking fraud-on-the-market that claimed the "stock price increased in reaction to the three allegedly misleading statements"). In an inflation maintenance case—although the Ninth Circuit has not ruled on the validity or contours of the theory—the plaintiff instead relies on the theory that the alleged misstatements did not cause a company's stock price to artificially increase, but rather prevented it from declining. *Goldman*, 594 U.S. at 120; *see Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at *7 (D. Nev. Mar. 1, 2023) (noting that the Ninth Circuit has not considered inflation maintenance).

Because under the inflation maintenance theory the stock price remains the same following the alleged misstatements, price impact is addressed differently than if the alleged misstatements caused the stock price to increase. In an inflation maintenance case, "price impact is the amount of price inflation maintained by an alleged

misrepresentation—in other words, the amount that the stock's price would have fallen without the false statement." *Goldman*, 594 U.S. at 123; *see also In re Vivendi S.A. Securities Litigation*, 838 F.3d 223, 258 (2d Cir. 2016) (observing that inflation maintenance theory asks "what would have happened if [the defendant] had spoken truthfully"). Plaintiffs relying on this theory

> typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation.

*Goldman*, 594 U.S. at 123. However, *Goldman* held that the "final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* This stands to reason: there is no basis to link alleged misstatements made at one point in time and disclosures made later, let alone infer that they had equal effects on the stock price, unless the statements are very closely linked in content.

The defendant in *Goldman* argued that, because the alleged misstatements were generic—such as "[w]e have extensive procedures and controls that are designed to identify and address conflicts of interest"—there was a "mismatch" between the statements and the corrective disclosures, which allegedly revealed specific conflicts of interest raised in a government enforcement action. *Id.* at 120. The Court observed, "[u]nder those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer

front-end price inflation—that is, price impact—from the back-end price drop." *Id.* at 123.

The *Goldman* Court directed lower courts to "take into account *all* record evidence relevant to price impact, regardless of whether that evidence overlaps with materiality or any other merits issue." *Goldman*, 594 U.S. at 124 (emphasis in original). "In assessing price impact at class certification, courts should be open to all probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Id.* at 122. "[T]he defendant bears the burden of persuasion to prove a lack of price impact" by a "preponderance of the evidence." *Id.* at 126.

### 3. The Inflation Maintenance Theory Requires That Any Gap Between Front-End And Back-End Statements As Written Be Limited

Under the "mismatch" test articulated in *Goldman*, "any gap among the front- and back-end statements as written [must] be limited" in order to support the back-end front-end inference. *Goldman II*, 77 F.4th at 99. In light of *Goldman*, and upon reviewing existing Second Circuit case law regarding the inflation maintenance theory, the *Goldman II* court, after remand from the Supreme Court, reversed the district court's order certifying a class, concluding that there was a "mismatch" between the alleged misstatements and alleged corrective disclosure. *Goldman II*, 77 F.4th at 97-99, 105.

The court began its analysis by discussing its prior case law in the context of inflation maintenance, specifically, *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), and *Vivendi,* 838 F.3d 223. In *Waggoner,* the plaintiffs alleged Barclays' officers made

numerous misstatements about a particular Barclays trading platform, including that it was "built on transparency" and had a "sophisticated surveillance framework that protects clients from predatory trading activity." *Waggoner*, 875 F.3d at 87. The purported corrective disclosure was a lawsuit brought by the New York Attorney General alleging the same or similar statements were false and misleading. *Id.* at 88; *see also Goldman II*, 77 F.4th at 97. The *Goldman II* court noted "*Waggoner* presented a tight fit" between the alleged front-end and back-end statements, there being "no question…that the corrective disclosure directly implicated not just the same topic, but the alleged misstatements themselves." *Goldman II*, 77 F.4th at 97.

In *Vivendi*, the plaintiffs alleged Vivendi made misstatements about its "comfortable" liquidity situation and "strong free cash flow." *Vivendi*, 838 F.3d at 235-36. The purported corrective disclosures "includ[ed] several downgrades to its debt rating, public reports regarding the company's lack of transparency about its large debt obligations, and, ultimately, the announcement that the company faced massive refinancing needs that would require a fire sale of assets." *Goldman II*, 77 F.4th at 98. Although, the *Goldman II* court noted, some of those disclosures did not "expressly reference[] the alleged misrepresentations," they "directly rendered false the company's affirmative misrepresentations," thus enabling the back-end front-end inference. *Id.*

Based on this case law, and echoing the Supreme Court's guidance in *Goldman*, the Second Circuit concluded that a generalized "subject-matter match" between the alleged misstatement and later disclosure is *insufficient* to support the inference—again,

25

critical in an inflation maintenance case—that the back-end price drop equals the front-end inflation. *Id.* at 93. Rather, the alleged corrective disclosure must "*expressly and specifically* negat[e] the alleged false statement," as in *Waggoner*, *id.* at 98, or "*directly render[] false* the company's affirmative misrepresentations," as in *Vivendi*. *Id.* The court further observed, consistent with *Waggoner* and *Vivendi*, that the Supreme Court's *Goldman* decision itself "requires that any gap among the front- and back-end statements as written be limited." *Id.* at 99.

When a gap exists, the court must consider "other indirect evidence of price impact" to support the back-end front-end inference. *Id.* at 102. Analyst reports "can provide insight into the kind of information investors would rely upon in making investment decisions—and therefore can serve as indirect evidence of price impact." *Id.* at 104. But, again, "commentary touching upon only the same subject matter…cannot be enough" to support the inference that, despite the difference in the back-end and front-end disclosures, the back-end reaction reflects that the market relied on the front-end statements. *Id.* Rather, the question is whether ***analysts reference the misstatements at issue***. *Id.* Absent such references, "there is an insufficient link between the corrective disclosures and the alleged misrepresentations." *Id.* at 105.

That the courts in *Goldman* and *Goldman II* required an exceptionally limited gap between the back-end and front-end statements stands to reason: again, in the inflation maintenance context, the plaintiff is attempting to support a *very specific inference* that the amount a stock price declined following a corrective disclosure *equaled* the amount by

which that price was previously inflated by the misstatements at issue. *See Goldman*, 594 U.S. at 123; *see also Goldman II*, 77 F.4th at 80 (describing inflation maintenance theory and concluding that the "back-end price drop—what happens when the truth is finally disclosed—operates as an indirect proxy for the front-end inflation"). "The back-end drop is, at most, backward-looking, indirect evidence, of the price impact at the time of *purchase*." *Goldman II*, 77 F.4th at 93. If the information in the back-end corrective disclosure does not "actually correct[]" the information in the alleged front-end misstatement, then there is no reason to consider any back-end price drop an "indirect proxy" for front-end inflation. *Goldman*, 594 U.S. at 123.

The *Goldman II* court explained that requiring a limited gap between the back-end and front-end statements in inflation maintenance cases is necessary to avoid "turning securities claims into a game of litigation-by-hindsight." *Goldman II*, 77 F.4th at 101. Otherwise, a plaintiff could (i) identify a corrective disclosure that impacted the stock price; (ii) identify a prior statement on the same subject matter as the corrective disclosure and allege it was a "misstatement," regardless if that prior statement had any impact on the stock price at the time made; and (iii) craft a link between the alleged corrective disclosure and alleged misstatement. *See Goldman II*, 77 F.4th at 99. *Goldman* and *Goldman II's* mismatch analysis prevents this tactic by making it clear that a subject-matter match, by itself, is not nearly enough. *Id.*

27

4. **Loss Causation Is A Different Element Of Securities Fraud From Reliance And Imposes A More Lenient Standard Than *Goldman*'s Mismatch Standard For Rebutting The Fraud-On-The-Market Presumption Of Reliance**

Notably, the inquiry in which courts engage to assess whether a defendant has rebutted price impact—and therefore defeated the fraud-on-the-market presumption—is not to be confused with loss causation, a separate element of securities fraud, which imposes a more lenient standard.

Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342. Often a plaintiff seeks to demonstrate loss causation by "identifying one or more corrective disclosures, which occur when information correcting the misstatement or omissions that is the basis for the action is disseminated to the market." *Espy v. J2 Global, Inc.*, 99 F.4th 527, 540 (9th Cir. 2024) (quoting *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020)). A plaintiff taking that approach must "allege with particularity facts 'plausibly suggesting' that 'a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements,' and that the disclosure 'caused the company's stock price to decline.'" *Id.*

At the pleading stage, the loss causation analysis merely requires that "[t]o be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *Id.* A plaintiff can also demonstrate loss causation by

proving that concealed or misrepresented facts are what caused a company's losses, "even where the alleged fraud is not necessarily revealed prior to the economic loss." *See also Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).

Because both loss causation and the fraud-on-the-market presumption examine stock price movements in response to particular disclosures, they can be easy to conflate and may rely on overlapping evidence. *See Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton*"), 563 U.S. 804, 807 (2011) (considering whether proof of loss causation is a necessary prerequisite to invoking the fraud-on-the-market presumption). However, they remain different. In the context of the fraud-on-the-market presumption, reliance depends on whether the information in an alleged misrepresentation "is reflected in [the] market price of the stock at the time of the relevant transaction." *Id.* at 812. Thus, under *Goldman*, accepting a presumption of reliance requires a *closer match* between the alleged misstatement and alleged corrective disclosure than is required to plead the element of loss causation. *See Goldman*, 77 F.4th at 99 n.11 (concluding that *Goldman* "requires a closer fit" between the front- and back-end statements than loss causation requires). Loss causation, in contrast, requires only a plausible connection and "requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Halliburton*, 563 U.S. at 812. Accordingly, "[l]oss causation addresses a matter different from whether an investor relied on a misrepresentation, presumptively or otherwise, when buying or selling stock." *Id.* Law addressing one element is plainly not interchangeable with law addressing the other.

29

**B.    Evidence Shows Defendants Met The *Goldman* And *Goldman II* Standard By Demonstrating A Mismatch And Therefore A Lack Of Price Impact**

**1.    The Mismatch Between The Alleged Misstatements And The Purported Corrective Disclosures Decisively Refutes Price Impact**

The District Court clearly erred in finding that Defendants failed to rebut the fraud-on-the-market presumption by a preponderance of the evidence. *See Goldman II*, 77 F.4th at 81 (reversing, rather than remanding for further fact finding, when conclusion was clearly erroneous); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 988 (9th Cir. 2011) (vacating district court's order granting class certification where court applied wrong legal standard in its analyses of Rule 23(a) requirements).

Where, as here, plaintiffs rely on the inflation maintenance theory, "courts must undertake a mismatch inquiry in price-maintenance cases to determine 'whether there is a basis to infer that the back-end price equals front-end inflation.'" *In re Kirkland Lake Gold Ltd. Securities Litigation*, 2024 WL 1342800, at *6 (S.D.N.Y. Mar. 29, 2024) (quoting *Goldman II*, 77 F.4th at 99 n.11). Although the Ninth Circuit has yet to speak on the issue, district courts within the circuit have set forth the following test for analyzing the mismatch framework under *Goldman*: "A finding of back-end price impact requires proof that the information disclosed…was (i) corrective of one or more prior false statements or omissions, (ii) new (unknown to the market prior to [the purported corrective disclosure date]), and (iii) value-relevant (*i.e.*, caused at least some of the stock price decline)." *Pardi*, 2024 WL 4336627, at *7; *see also In re FibroGen Securities Litigation*,

2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024) (setting forth same test). Here, Defendants have shown by a preponderance of the evidence that none of the four corrective disclosures satisfies all of these three elements.

### a. The Purported Corrective Disclosures Did Not Correct Any Alleged Misstatement

"[R]evelations that are not 'corrective' cannot form the basis for a corrective disclosure." *FibroGen*, 2024 WL 1064665, at *12. To be corrective in the inflation maintenance context, a back-end disclosure must "expressly and specifically negat[e] the alleged false statement" or "directly render[] [it] false." *Goldman II*, 77 F.4th at 98; *Waggoner,* 875 F.3d at 87-88 (corrective disclosure directly implicated not just same topic but alleged misstatements themselves). The "back-end disclosures' corrective effect upon the affirmative misrepresentations" should be "obvious." *Goldman II*, 77 F.4th at 98; *Vivendi,* 838 F.3d at 236-37 (company's repeated statements regarding comfortable liquidity situation contradicted by later reports of its large debt obligations). In other words, the "import of the corrective disclosure [must] render[] the…statements false." *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 2024 WL 1497110, at *16 (S.D.N.Y. Apr. 5, 2024).

Here, Plaintiff alleges Defendants made misstatements about Zillow's pricing algorithms and durable operational improvements that artificially maintained Zillow's stock price on two dates—August 5 and September 13, 2021—because Defendants did not disclose on those dates that (i) Zillow used overlays to increase offer prices; and

(ii) Zillow reduced the scope and pay of renovation projects resulting in contractors "deprioritizing" Zillow jobs. 5-ER-964-71. Under *Goldman II*, any corrective disclosure should refer back to those statements or disclose the information Plaintiff alleges was misleadingly omitted—the use of overlays or the reduction in renovation scope. The question is "what would have happened" with Zillow's stock on August 5, 2021 and September 13, 2021 "if [Defendants] had spoken truthfully." *Goldman II*, 77 F.4th at 97. Here, speaking truthfully means disclosing the use of overlays and reduction in renovation scope leading to job refusals—the information that allegedly made the statements misleading and capable of maintaining inflation in the first place. That different information was disclosed in the alleged corrective disclosures does not answer what would have happened if Zillow had disclosed the allegedly omitted information.

Indeed, none of the purported corrective disclosures said anything about overlays or renovation scope. They did not even mention anything about Zillow's statements about improving its pricing algorithms or making durable operational improvements. On the contrary, the use of overlays and alleged changes in renovations scope was not disclosed until *after the class period* on November 9 and 17, 2021, when *Business Insider* and *The Wall Street Journal* reported on them. Those articles had *no effect on Zillow's stock price*. 2-ER-232-35.

Specifically, the October 4, 2021 RBC report—the first alleged corrective disclosure—concluded that Zillow had accumulated too much inventory in Phoenix

and overpaid for that inventory. 2-ER-209. It did not correct any alleged misstatements about how Zillow was adjusting its pricing methods or implementing durable operational improvements, let alone disclose that Zillow was using price overlays and reducing renovations scope. *Id.* Similarly, the October 17-18, 2021 disclosures that Zillow was pausing home acquisitions did not disclose that Zillow applied overlays to its pricing model or reduced the scope of renovations, let alone that the acquisitions pause was due to those actions. 2-ER-213. Likewise, the October 31, 2021 KeyBanc analysis and the November 1, 2021 Bloomberg article did not address the alleged misrepresentations, any pricing "overlays," or whether Zillow reduced the scope or pricing for renovations. 2-ER-217. Nor did Zillow's announcements on November 2, 2021. 2-ER-224-25.

Plaintiff submitted no evidence to the contrary. Dr. Nye's primary response to Dr. Sabry's findings was to express the legal opinion (itself improper) that Dr. Sabry's analysis was too demanding for a loss causation standard—a standard inapplicable here. 2-ER-74, 2-ER-88, 2-ER-106. For example, citing a loss causation case, *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 483 (E.D. Pa. 2021), he argued that "corrective information" need not "take a particular form" or "be a mirror image tantamount to a confession of fraud." 2-ER-87-88. However, rather than offer a legal opinion about a loss causation standard, Dr. Nye should have examined whether any of the purported corrective disclosures "actually corrected" any prior statement by Zillow, *Goldman*, 594 U.S. at

123, such that it could act as an "indirect proxy for the front-end inflation," *Goldman II*, 77 F.4th at 80. Dr. Nye did not do so.

Further, Dr. Nye parroted Plaintiff's theories of falsity and loss causation—which, as described below, the District Court wrongly adopted in its order. 2-ER-74-75, 2-ER-88-90, 2-ER-106-07. But, again, whether the alleged corrective disclosures can be linked to Plaintiff's losses is not the question. (*See supra* Section I.A.4.) The question is whether any stock price reaction following a corrective disclosure can act as an "indirect proxy" for front-end price impact. *Goldman II*, 77 F.4th at 80. Dr. Nye expressed no view on this critical question, leaving Dr. Sabry's analysis unrebutted.

> ### b. The October 4, October 31, And November 2 Purported Corrective Disclosures Did Not Disclose Any New Information Related To The Alleged Misstatements

Not only did none of the four purported corrective disclosures provide information that corrected the alleged misstatements, three of the supposed disclosures repeated already public information instead of disclosing ***any new information*** related to the alleged misstatements, further confirming that there was no price impact.

"The [fraud-on-the-market] presumption…is rebuttable…by showing that the market was already aware of the truth behind the defendant's supposed falsehoods and thus that those falsehoods did not affect the market price (the so-called 'truth-on-the-market' defense)." *See Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1173-74 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013). Where "alleged corrective disclosures only repeated already public information," such evidence "makes it less likely that

Defendants' alleged misrepresentations inflated [the] stock price on the front end and the information in the disclosures caused the price drop on the back end." *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *13 (S.D. Cal. Mar. 20, 2023); *see also Pardi*, 2024 WL 4336627, at *6 (noting "if the information is already known to the market…the misrepresentation cannot then defraud the market").

Here, three of the alleged corrective disclosures reported information already known to the market.

**First**, the October 4, 2021 RBC report stated Zillow bought homes in Phoenix at "too high a price." 3-ER-369. The report was based on publicly available third-party data—the prices at which Zillow purchased and listed homes—that was readily available to analysts and investors. 2-ER-210. Indeed, the report itself commented, "we think this is generally already…understood and discounted in the stock." 3-ER-369. "[T]he fact that there was public information available…that mirrors the corrective disclosures makes it less likely that the corrective disclosures were actually curative." *Qualcomm*, 2023 WL 2583306, at *13.

Even Dr. Nye acknowledged that there was no statistically significant stock price reaction in response to the October 4 RBC report. 2-ER-52. Plaintiff also conceded the October 4 RBC report was not in fact a corrective disclosure by failing to address it below. 2-ER-32; *see also Beam*, 43 F. Supp. 3d at 1170 (finding party who failed to address issue in responsive brief "conceded on this issue").

***Next***, the October 31 KeyBanc analysis and Zillow's November 2 earnings announcement—two other purported corrective disclosures—also merely repeated publicly available information. Both the October 31 and November 2 disclosures reported that Zillow had overpaid for homes. 3-ER-413, 3-ER-349. In particular, the KeyBanc analysis stated that 66% of Zillow's homes were for sale below their purchase price. 3-ER-414. "Across the entire sample set," KeyBanc reported, "the value weighted pricing was a 2.0% discount vs. purchase price." *Id*. The November 2 earnings announcement reported, among other things, that Zillow was winding down ZO in part because it had "been unable to accurately forecast future home prices at different times in both directions." 3-ER-354.

However, that Zillow had overpaid for homes and failed to accurately forecast prices—based on analysis of publicly available data—had already been publicly disclosed multiple times. The October 4 RBC report said as much. 3-ER-368. No fewer than seven additional analyst or news reports discussed that Zillow was listing homes for resale at prices lower than for what it purchased them. 2-ER-218-20, 3-ER-424-524. For example, on October 19, 2021, real estate analyst Mike DelPrete reported that Zillow "continued to purchase homes well above the market median—a full $65k higher in September," and was "continu[ing] to pay top dollar to fuel acquisitions at a time when the market was cooling." 3-ER-427. Similarly, on October 28, 2021, a Bank of America analyst reported, just as KeyBanc did several days later, "on average Zillow is selling homes for 2% less than the purchase price" and "current selling prices are 6%

lower than the initial price." 3-ER-502. Yet ***none*** of these disclosures was followed by a statistically significant decline in Zillow's stock price. 2-ER-218-21. If these reports had no effect on Zillow's stock price, the October 31 KeyBanc report and November 2 earnings call repeating the same information could not have had any effect either. *IBEW*, 818 F.3d at 782 (no price impact where purported disclosures "added nothing to what was already public"). Indeed, the only "new" information in the November 2, 2021 announcement was Zillow's decision to wind down ZO. But the November 2 disclosure to wind down the business could not have corrected any alleged misrepresentation on August 5, 2021 or September 13, 2021 because Zillow had not decided to close ZO by either of those earlier dates.

Plaintiff's only response to this was to acknowledge that "Zillow's stock prices would have already reflected the prior analyst reports cited by Dr. Sabry," and to speculate "the price declines observed on November 1 and 2, 2021 must have been in response to release of incremental, new, material information." 2-ER-99. However, Dr. Nye does not dispute that the reports Dr. Sabry identified contained identical information to the KeyBanc report, nor does he suggest what this "incremental, new, material information" was. He also states, "Dr. Sabry has not identified any other competing information that can explain the reaction of Zillow's stock prices on these days," 2-ER-99-100, but, in fact, Dr. Sabry gave extensive alternative explanations for what drove the stock price movements on November 1 and November 2, 2-ER-222-23, 2-ER-225-26.

### c. Information In The Purported Corrective Disclosures Was Not Value-Relevant

If information in a purported corrective disclosure "cause[s] at least some of the stock price decline," it is "value-relevant." *Pardi*, 2024 WL 4336627, at *7. In *Pardi*, the district court found that a "disclosure was value relevant" where the "stock price fell 30.57% in response to [its] revelations" related to the alleged fraud. *Id.* at *12. However, if stock price declines are reactions to information in the disclosure unrelated to the alleged misstatements, the alleged corrective disclosures are not value-relevant. *FibroGen*, 2024 WL 1064665, at *12 ("It is critical that the price drop be attributable to a corrective disclosure, because otherwise the 'causal link' between the alleged misrepresentation and the price impact will have been severed."). "[M]arket commentary can provide insight into the kind of the information investors would rely upon in making investment decisions," so if analysts do not refer to the alleged misstatements at issue, that is evidence those statements had no impact. *Goldman II*, 77 F.4th at 104.

In *Kirkland*, for example, the plaintiff alleged that a CEO misled investors about the company's plans to acquire a gold mining company by stating that the company's focus was on organic growth and that it had minimum targets for asset acquisitions. 2024 WL 1342800. The falsity of those misstatements was allegedly revealed when the company announced its acquisition of the gold mining company, Detour. The court noted that "no analyst who covered the Detour acquisition referred back to the [alleged

misstatements] to state that Detour's failure to meet those targets resulted in the decline in share price." *Id.* at *12; *see also id.* at *9 ("Evidence from contemporaneous analyst reports also supports the absence of price impact."). The court proceeded to find that Defendants had, by a preponderance of the evidence, "severed the link between the back-end price drop and front-end misrepresentation" and thus "successfully rebutted the *Basic* presumption of reliance on the [statement]." *Id.* at *12.

Here, Defendants showed by a preponderance of the evidence that the stock price declines were due to factors unrelated to the alleged misstatements, rebutting any "reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Goldman*, 594 U.S. at 123.

***First***, with respect to the October 4 RBC report, Plaintiff's own expert acknowledged the lack of a statistically significant price reaction. 2-ER-209-10.

***Second***, with respect to the October 17 Bloomberg article and October 18 announcement about Zillow's pause in home acquisitions due to a backlog in renovations, Dr. Sabry analyzed contemporaneous analyst commentary and opined that the resulting stock price decline was due to factors unrelated to the alleged misstatements. 2-ER-214-16. She found that no equity analysts who covered the acquisitions pause "reported or speculated that Zillow had created a 'pricing overlay'" nor "attributed the pause in purchases to Zillow's alleged reduction to the scope of renovations or reduced payments to contractors." 2-ER-214. Rather, analysts attributed the acquisitions pause to major issues unrelated to Plaintiff's claims—the "economy-

wide labor shortage," the "market softening," or "Zillow's untimely increase in home acquisitions." 2-ER-214-15 (citing analysts commenting "abundant challenges in the homebuilding sector" were apparent and "labor shortages in the economy [we]re real"). Dr. Sabry further explained how these issues were consistent with macroeconomic conditions at the time, with "customer demand for home services…at an all-time high" in the wake of the COVID-19 pandemic, "labor shortages" in the construction industry, and "global and domestic supply chain bottlenecks" resulting in "high cost" for materials needed to perform renovations. 2-ER-213-14.

*Third*, with respect to the October 31 KeyBanc analysis and November 1 Bloomberg report, Dr. Sabry observed that following the October 31 alleged disclosure, analysts continued to cite, among other things, the macro-economic concerns that were affecting Zillow, and following the November 1 disclosure, "equity analysts determined that the news raised the possibility that Zillow would exit Zillow Offers." 2-ER-222-23. Notably, Dr. Sabry observed that Zillow's stock price closed *higher* at the end of trading on November 1 (after the KeyBanc and Bloomberg reports) than on October 27 (immediately prior to the October 28 Bank of America report disclosing the same information as the October 31 KeyBanc report). 2-ER-221-22. As such, the stock price decline on November 1 was instead largely a reversal of a stock price spike that had been caused by a large order at the close of trading on Friday, October 29, and therefore not a reaction to the KeyBanc or Bloomberg report. 4-ER-647-49 (showing a volume of 5,263,645 shares of Zillow Class A stock traded with a closing price of $105.72 on

40

October 29, as compared with a volume of 1,102,505 shares and a closing price of $100.56 on October 28, and 2,781,148 shares and a closing price of $96.61 on November 1); 4-ER-651-53 (showing volume of 17,376,416 shares of Zillow Class C stock traded with a closing price of $103.63 on October 29, as compared with 5,951,601 shares and a closing price of $98.60 on October 28 and 8,776,700 shares and a closing price of $97.15 on November 1).

**Fourth**, with respect to the November 2 earnings announcement, Dr. Sabry observed that, as with all the other alleged disclosures, "no equity analysts reported or speculated that Zillow had created a 'pricing overlay' or had reduced the scope of renovations or payments," the alleged misstatements that the disclosures purportedly corrected. 2-ER-225. The magnitude of the price decline following Zillow's announcement on November 2 is better explained by the market's learning that Zillow had decided to end an entire business segment, not that the market suddenly realized that vague statements about improved pricing models and "durable operational improvements" from months earlier were not true and that the statements could no longer maintain Zillow's allegedly inflated stock price.

In light of the above observations, Dr. Sabry found that in no instance did **any equity analyst** attribute any information disclosed in the purported corrective disclosures to the allegedly previously concealed information or misstatements. 2-ER-209, 2-ER-214, 2-ER-222, 2-ER-225. And, in line with the proper legal standard for assessing price impact, she testified that an analyst report would have to "address issues

41

about the valuation of pricing overlays or a reduction in the scope [of renovations] as one of [its] reactions to…the alleged corrective disclosure" in order for the report to result in a "match," in other words, to be value-relevant for purposes of price impact. 2-ER-54-55 (alterations in original).

Plaintiff did not rebut this evidence. Rather, Dr. Nye opined that news outlets attributed the respective stock price declines to the **corrective disclosures themselves**, namely, "the Company's announcement that it would pause new home purchases," 2-ER-70, the "KeyBanc and *Bloomberg* reports," 2-ER-84, and "the Company's announcement that it would wind down Zillow Offers" and write down inventory, 2-ER-102, 2-ER-117. That evidence does not address the relevant legal question.

The relevant question is whether the news outlets Dr. Nye identified indicate that Zillow's earlier alleged *misstatements* impacted Zillow's stock price, not whether the later *corrective disclosures* themselves impacted Zillow's stock price. *See Goldman II*, 77 F.4th at 103 (finding analyst commentary surrounding purported corrective disclosures that merely "touche[d] on the *subject*" of the alleged misstatements "d[id] not suggest that the market relied *on the…statements*" (emphasis in original)). Rather than engage with, much less rebut, Dr. Sabry's evidence, Dr. Nye merely complained that Dr. Sabry did not apply a loss causation standard. 2-ER-55-56 (string citing loss causation cases). But the appropriate standard is *Goldman*'s mismatch framework, not a loss causation standard. Dr. Sabry's evidence remains unrebutted.

42

## 2. A Good Dose Of Common Sense Refutes Any Price Impact

As the Supreme Court noted, a court's price impact analysis must also be aided by a "good dose of common sense." *Goldman*, 594 U.S. at 122. "Utilizing a back-end price drop as a proxy for the front-end misrepresentation's price impact works only if, at the front end, the misrepresentation is propping up the price—that is,…if [the] alleged misstatements reinforced the market's misconception." *Goldman II*, 77 F.4th at 100. Here, common sense further refutes any price impact. *See Qualcomm*, 2023 WL 2583306, at *13 (finding where "alleged corrective disclosures only repeated already public information," that "[a]t a 'common sense,' level, this evidence makes it less likely that Defendants' alleged misrepresentations inflated Qualcomm's stock price on the front end and the information in the disclosures caused the price drop on the back end").

Plaintiff's theory is that vague statements Zillow made about improved pricing models, consumer demand, and durable operational improvements—because they did not also disclose the use of overlays and reduced renovations scope—maintained inflation in the price of Zillow's common stock until that inflation was removed following a series of corrective disclosures. Under this theory, the stock price decline following the supposed "corrective disclosure[s]" approximates the amount of artificial inflation the "front-end" alleged misstatements caused. *See Goldman*, 594 U.S. at 123. According to Plaintiff, Zillow lost approximately $11 billion—or half of its market capitalization—when the price declines from the various alleged corrective disclosures

43

are combined. 2-ER-229-30, 5-ER-898. So, according to Plaintiff, the vague statements on a mere two dates—August 5 and September 13—concerning pricing models and operational improvements **propped up half of Zillow's market capitalization**. This strains credulity.

Dr. Sabry found that the alleged misstatements on August 5 and September 13, 2021 had no price impact at the time they were made, i.e., no "front-end" price impact, and that Zillow's stock price actually declined following the August 5, 2021 alleged misstatements after multiple analysts reduced their valuations of ZO. 2-ER-195, 2-ER-201-02, 2-ER-204. It defies common sense to conclude that alleged misstatements that had no impact when they were made—and one of which was even followed by a *decrease* in Zillow's stock price—somehow singlehandedly maintained $11 billion worth of inflation.

Rather, the stock price decline reflected the market's growing awareness of Zillow's potential exit from the iBuying business, 2-ER-214-15, and following the November 2, 2021 earnings call, "reflect[ed] Zillow's strategic decision in the face of previously disclosed difficulties of the iBuyer industry," 2-ER-228. In other words, the stock price declined because Zillow was shutting down a major business segment that it ultimately realized had "a high likelihood…of putting the whole company at risk," 3-ER-359, not because the market had been relying on Zillow's vaguely optimistic statements from months earlier about improving that business segment's pricing models and durable operational improvements—and suddenly understood those

44

statements to be false due to the use of overlays and difficulty hiring contractors. In fact, no analysts even referenced the alleged misstatements after Zillow's stock price declined, *see generally* 2-ER-160; 2-ER-47, and the alleged use of overlays and reductions in renovations scope were disclosed in news articles only *after* the class period, 2-ER-232. In other words, the market could not have reacted to the disclosure of this information at the time, because the market did not know it at the time. And when the information was disclosed later on, the stock price had no statistically significant reaction. 2-ER-232-35.

Below, the District Court expressly declined to assess front-end price impact and thus did not consider this evidence. 1-ER-14. When viewing the evidence as a whole and within context, the only supportable conclusion is that Zillow, by a preponderance of the evidence, has shown it was more likely than not that the statements at issue had no price impact. The District Court's conclusion to the contrary was clear error and should be reversed.

## II. THE DISTRICT COURT COMMITTED MULTIPLE LEGAL ERRORS IN CERTIFYING A CLASS

The District Court certified a class despite the preponderance of the evidence clearly demonstrating a lack of price impact because it committed two legal errors in its analysis: (i) it applied the plausibility loss causation standard instead of the close match required by *Goldman*; and (ii) it relied on Plaintiff's allegations instead of considering all evidence.

**A.** **The District Court Erroneously Applied The Loss Causation Plausibility Standard Instead Of The *Goldman* Mismatch Standard**

The District Court improperly applied a plausibility standard for loss causation, rather than *Goldman*'s more stringent mismatch standard. The Ninth Circuit case law the District Court cited to certify a class makes this clear. The District Court cited *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1184 (9th Cir. 2024), a loss causation case, for the proposition that a "corrective disclosure…need not 'precisely mirror' the misrepresentation." It then cited *BofI*, which reversed in part a dismissal based on failure to plead loss causation, noting a plaintiff must allege "the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading" to state a claim. 977 F.3d 781, 790. Similarly, it cited *Mineworkers*, another loss causation case, for the proposition that a corrective disclosure need only disclose the consequences of alleged misrepresentations. 881 F.3d 750, 753-54 (noting "[d]isclosure of the fraud is not a sine qua non of loss causation").

The District Court improperly relied on this loss causation standard when considering each of the four purported corrective disclosures. This was reversible error, and as shown above (*see supra* Section I.B), each of the four purported corrective disclosures do not satisfy the correct and more stringent *Goldman* mismatch standard.

***First***, with respect to the October 4 disclosure, both parties agree it cannot establish the applicability of the fraud-on-the-market presumption of reliance. 2-ER-52, 2-ER-209-10.

**Second**, with respect to the October 17-18 disclosures, the District Court observed that Plaintiff *alleged* that "the backlog disclosed on October 17-18 happened because of the information Defendants concealed"—i.e., the reductions in renovation scope and contractor reactions. 1-ER-16. Then, the District Court improperly applied a loss causation standard rather than *Goldman's* mismatch standard, and concluded based on Plaintiff's allegations that the October 17-18 alleged corrective disclosures "render[ed] *some* aspect" of the prior statements misleading and thus qualified as corrective disclosures. *Id.* (citing *BofI*, 977 F.3d at 790). However, that a loss allegedly occurred "*because of* the information Defendants concealed," 1-ER-16, addresses whether an alleged misstatement "caused a subsequent economic loss," i.e., loss causation, *Halliburton*, 563 U.S. at 812. It does not address Defendants' showing that the "information Defendants concealed," 1-ER-16, was not "reflected in [the] market price of the stock at the time of the relevant transaction" in the first place, *Halliburton*, 563 U.S. at 812; (*see supra* Sections I.A.4, I.B). The Court did not address that question at all.

**Third**, with respect to the October 31 and November 1 alleged corrective disclosures, the District Court observed that Plaintiff *alleged* "[t]he overpayments KeyBanc disclosed were…the result of Zillow's decision to apply overlays to increase acquisition volume." 1-ER-17. Then, the District Court concluded based on Plaintiff's allegations that, because the October 31 and November 1 reports "disclose[d] the consequences of Zillow's alleged misrepresentations, they are corrective disclosures

capable of having a price impact." *Id.* (citing *Mineworkers*, 881 F.3d at 753-54). Here too, the District Court answered the wrong question. The question is not whether the back-end October 31 and November 1 statements caused investor losses or were "capable" of having a price impact. The question is whether the front-end August 5, 2021 and September 13, 2021 alleged misstatements "actually affect[ed] the stock's market price" at the time those statements were made and whether any price reaction following the later October 31 and November 1 statements can serve as a proxy for front-end impact. *See Halliburton II*, 573 U.S. at 282; *see also Halliburton*, 563 U.S. at 812. The District Court did not address that question. Instead of applying *Goldman*'s mismatch standard, the District Court merely concluded that Plaintiff had alleged loss causation.

Moreover, relying on *Genius Brands*, a loss causation case, the District Court rejected Defendants' contention that the October 31 KeyBanc report could not show price impact because it did not report anything new. The District Court reached this conclusion notwithstanding that the information in the KeyBanc report had been reported on no fewer than eight prior occasions. 2-ER-218-20, 3-ER-368, 3-ER-424-524. To the extent Defendants' alleged misstatements maintained any front-end inflation, that inflation would dissipate *the first time* the corrective information was disclosed. *See Conn. Ret. Plans*, 660 F.3d at 1173-74 ("The [fraud-on-the-market] presumption…is rebuttable…by showing that the market was already aware of the truth behind the defendant's supposed falsehoods and thus that those falsehoods did not affect the market price (the so-called 'truth-on-the-market' defense)."); *see also Pardi*,

2024 WL 4336627, at *6 (noting "if the information is already known to the market…the misrepresentation cannot then defraud the market"). As discussed above (*see supra* Section I.B.1.b), the first time the information was disclosed, however, and the seven times after that, it had ***no statistically significant price reaction***, indicating that there was no front-end inflation to remove from the stock price. 2-ER-209, 2-ER-221.

The District Court did not conclude after examining the various disclosures that, contrary to Dr. Sabry's report, the information in the October 31 KeyBanc report was in fact new (nor could it have). Rather, the District Court concluded that "Defendants' contention is unpersuasive because" it would not defeat a finding of loss causation. 1-ER-17-18. The District Court's reliance on *Genius Brands* is further proof the District Court applied the wrong standard to the wrong result (*see supra* Section I.B.1.b).[4]

---

[4] Not only did the District Court improperly rely on *Genius Brands*, it did so in a way that disregarded the undisputed evidence before it. *Genius Brands* noted "a disclosure based on publicly available information can, in certain circumstances, constitute a corrective disclosure" for loss causation purposes, e.g., where the publicly available information is "on some webpage tucked in a deep corner of the internet or buried in some unwieldy spreadsheet," and it "is so hidden that the market cannot access or understand it accordingly." 97 F.4th at 1186. Here, the publicly-available disclosures that predated the October 31 KeyBanc report were widely circulated. The October 4 and October 19-29 articles that disclosed substantially the same information as the KeyBanc report were issued by major investment banks, major news outlets, or well-known bloggers—including, for example, Bloomberg, Bank of America, and Business Insider. 3-ER-489, 3-ER-501, 3-ER-517. As Plaintiff's own expert, Dr. Nye, stated in his report, such analysts and financial news commentators are "conduits to the market" and "facilitate the dissemination of new information to investors and any corresponding
*(cont'd)*

49

**Fourth**, with respect to the last purported corrective disclosure, the November 2 announcement, the District Court again focused on the Plaintiff's allegations, noting that "[a]ccording to Jaeger, Zillow had told investors that it had improved its pricing algorithm's ability to forecast future home prices" but later "admitted that it was shuttering Zillow Offers because its pricing models had been unable to accurately forecast future home prices." 1-ER-18. Then, citing loss causation cases again, the District Court incorrectly concluded that merely "[c]ontradicting earlier representations" or "[d]isclosing the consequences of concealed information" sufficed to make a disclosure corrective for purposes of finding price impact. 1-ER-18-19 (citing *In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *9 (N.D. Cal. Feb. 4, 2022) (quoting *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *18 (S.D.N.Y. Jan. 26, 2021), which applied loss causation standards pre-*Goldman II*)); 1-ER-19 (citing *Mineworkers*, 881 F.3d at 753-54). The District Court reached this conclusion based on Plaintiff's allegations, despite Defendants' evidence that it was *already public* that Zillow had been unable to accurately forecast home prices, so the stock price movements on November 2 had to have been caused by something else—specifically, Zillow's decision to wind down ZO.

---

price reaction in a company's securities." 4-ER-603. Specifically as to Zillow, Dr. Nye stated that articles about Zillow "appeared in major domestic and international news media including:…Bloomberg; Business Insider." 4-ER-604. In his rebuttal report, Dr. Nye acknowledged that the information in these reports would have been reflected in the market price for Zillow stock. 2-ER-99.

Ultimately, the District Court concluded that because Plaintiff's complaint *alleged* that the back-end statements qualified as "corrective disclosures" under the loss causation standard, Defendants failed to *prove* lack of price impact. 1-ER-19. The District Court did not consider whether the alleged back-end statements "expressly and specifically negated the alleged false statement," "directly rendered false the company's affirmative misrepresentations," or otherwise sufficiently matched the front-end statements to support the back-end front-end inference. *Goldman II*, 77 F.4th at 98. And as shown above (*see supra* Section I.B.1), the answer to each of those questions is unquestionably "no."

The District Court's approach was incorrect as a matter of law. If a plaintiff's pleading of a corrective disclosure under a loss causation standard, by itself, were sufficient to defeat any rebuttal of the inflation maintenance theory, as the District Court implicitly found, then a defendant could never rebut the fraud-on-the-market presumption on a complaint that already passed the pleading stage. The pleading alone would be the first and last word on the matter, and there would be no need to adjudicate the issue in determining class certification. That result would defy law and common sense alike. The District Court's substitution of the loss causation standard for the proper standard for assessing price impact was reversible legal error. *B.K.*, 922 F.3d at 965.

**B.    The District Court Erroneously Failed To Take Into Account All Record Evidence Relevant To Price Impact**

The District Court compounded its error by also failing to consider all evidence relevant to price impact, as required by Supreme Court precedent. *Goldman*, 594 U.S. at 122.

It is well-established that "a court has an obligation before certifying a class to 'determine that Rule 23 is satisfied, even when that requires inquiry into the merits.'" *Goldman*, 594 U.S. at 122 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (holding that courts must conduct a "rigorous analysis" at the class certification stage). Courts "must take into account *all* record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue." *Goldman*, 594 U.S. at 124 (emphasis in original). While plaintiffs may establish reliance indirectly by invoking the fraud-on-the-market presumption, the law "does not require courts to ignore a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply." *Halliburton II*, 573 U.S. at 282.

The District Court expressly did not consider all record evidence. Rather, the District Court largely ignored the evidence Defendants submitted and deferred to the allegations in the complaint, without weighing the evidence at all. As shown above (*see supra* Section I.B), weighing all the evidence that was before the District Court leads to

the clear conclusion that the alleged misstatements did not impact Zillow's stock price under the relevant *Goldman* standards.

**First**, the District Court explicitly refused to consider or weigh evidence on the basis that it "goes to loss causation and the merits" and thus "does not preclude class certification." 1-ER-16. Specifically, Defendants demonstrated that no analyst referred to the allegedly concealed information about overlays or renovations scope or to the alleged misstatements themselves, and according to analyst commentary following each corrective disclosure, the resulting stock price declines were attributable to factors unrelated to the alleged misstatements. In particular, with respect to the October 17-18 disclosures, Dr. Sabry analyzed contemporaneous analyst commentary and opined the resulting stock price decline was due to factors unrelated to the alleged misstatements. (*See supra* Section I.B.1.c.) "Market commentary can provide insight into the kind of the information investors would rely upon in making investment decisions," so if analysts do not refer to the alleged misstatements at issue, that is evidence those statements had no impact. *Goldman II*, 77 F.4th at 104.

By refusing to consider this evidence, the District Court violated the admonition in *Goldman* to "take into account all record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue." *Goldman*, 594 U.S. at 124. Just because the evidence "goes to loss causation and the merits" does not mean it does not also make it more likely than not that the alleged misstatements had

no price impact. Yet, in clear contravention of this Supreme Court mandate, the District Court did not consider how the evidence related to price impact.

*Second*, throughout its order, the District Court did not assess the evidence in the record at all, instead analyzing and accepting the allegations in the complaint. With respect to the October 17-18 disclosure, the District Court credited that, "*[a]ccording to Jaeger*, the backlog disclosed on October 17-18 happened because of the information Defendants concealed" and that "*Jaeger alleges* Zillow acquired increased house inventory because of its use of the undisclosed overlay." 1-ER-16. With respect to the October 31-November 1 disclosure, the District Court credited that "[t]he overpayments KeyBanc disclosed were, *according to Jaeger's allegations*, the result of Zillow's decision to apply overlays to increase acquisition volume." 1-ER-17. With respect to the November 2 disclosure, the District Court similarly accepted that, "*[a]ccording to Jaeger*, Zillow had told investors that it had improved its pricing algorithm's ability to forecast future home prices, but then on November 2, Zillow admitted that it was shuttering Zillow Offers because its pricing models had been unable to accurately forecast future home prices." 1-ER-18. The District Court's refusal to consider evidence and insistence on assuming the truth of Plaintiff's allegations contravenes Supreme Court precedent.

*Third*, a review of the District Court's order as a whole reveals that the District Court gave little, if any, consideration to the evidence Defendants submitted. In its entire analysis of the price impact question, the District Court referred to Dr. Sabry's

report only once and cited only four out of 177 paragraphs. 1-ER-16-18. Even when it did discuss the evidence, the District Court misapprehended its import.

For example, the District Court stated that "Defendants…assert that [the October 17-18] disclosures did not have a price impact because analysts did not discuss the disclosures," and cited Dr. Sabry to conclude that "some analysts did write about the Bloomberg article and Zillow press release." 1-ER-16. However, Defendants did not argue that analysts did not discuss the alleged *corrective disclosures*. They argued that, among those analysts who discussed the October 17 and 18 disclosures, no analyst discussed the **alleged misstatements** or **attributed the pause to the allegedly concealed facts**, which is the pertinent link as to whether there was price impact. 3-ER-569 ("If the October 17 and 18 disclosures revealed alleged misstatements, one would expect analysts to discuss them," i.e., the misstatements); (*see supra* Section I.B.1.a).

With respect to the October 31 KeyBanc report, the District Court noted that "multiple commentators…attributed price declines to the KeyBanc report" and that "the report was widely discussed in the media for weeks after its publication." 1-ER-18. Such evidence is likewise immaterial, as the proper test is whether the commentators attributed price declines to revelation of the alleged misstatements, not to the KeyBanc report itself.

With respect to the alleged corrective disclosures on November 1 and 2, the District Court cited Dr. Sabry's deposition testimony to conclude that a statistically

55

significant stock price reaction occurred on those days. 1-ER-18. Again, ignoring Defendants' evidence, the District Court then incorrectly stated that "[n]either Defendants nor their expert identify any reasons for these occurrences." *Id.*[5] But Defendants *did* "identify…reasons" for the November 1 and 2 stock price declines, which the District Court did not acknowledge. In particular, Dr. Sabry studied market commentary between October 31 and November 2, finding analysts cited significant macro-economic issues that posed serious concerns for Zillow and also speculated Zillow would shut down Zillow Offers. 2-ER-106-07. Notably, Dr. Sabry observed that following these disclosures, not a single analyst cited the overlays or reductions in renovations scope as a reason for the stock price declines. 2-ER-222-23. Further, Dr. Sabry examined stock price movement following the previous disclosure of the same or similar information as in the October 31 KeyBanc report (as discussed further above, *see supra* Section I.B.1.b), which proves that the price reaction was not to the KeyBanc report—and could not have been—because nothing in the report was new, 2-ER-218-21.

Dr. Nye concluded that "several financial news publications attributed some or all of the November 1 and 2, 2021 price declines to the findings of the KeyBanc report."

---

[5] Ironically, the District Court refused to consider the Defendants' evidence concerning the October 17-18 disclosures about alternate explanations for the stock price declines because such evidence went to "loss causation and the merits," 1-ER-16, but inconsistently ***faulted*** Defendants for supposedly failing to supply such evidence concerning the October 31 and November 1 disclosures.

2-ER-93. But, in an efficient market, only *new* information causes a stock price to move. Because the information in the KeyBanc report was not new, the information was already reflected in the market price from the prior disclosures. It could not have caused additional movement. *Amgen*, 568 U.S. at 458 (noting under *Basic*'s premise, "the price of a security traded in an efficient market will reflect all publicly available information about a company").

"[A] court cannot conclude that Rule 23's requirements are satisfied without considering *all* evidence relevant to price impact," *Goldman*, 594 U.S. at 122 (emphasis in original), "regardless [of] whether that evidence overlaps with materiality or any other merits issue," *id.* at 124. By refusing to consider all evidence of price impact and instead rejecting it because it went to the "merits," cherry-picking Defendants' evidence and taking it out of context, relying on Plaintiff's allegations alone, and not weighing competing evidence, the District Court committed reversible legal error. *B.K.*, 922 F.3d at 965.

## **CONCLUSION**

The Court should reverse the District Court's decision, and, because Defendants by a preponderance of the evidence in the record demonstrated that the alleged misrepresentations did not impact Zillow's stock price, remand with instructions to decertify the class. At a minimum, the Court should vacate the District Court's decision and remand with instructions to apply the standards set forth in *Goldman* and *Goldman II*.

DATED:  January 8, 2025                           Respectfully submitted,


                                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                    By: _____/s/ Peter B. Morrison_____
                                                      Peter B. Morrison
                                              Attorneys for Defendants-Appellants

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____24-6605_____

I am the attorney or self-represented party.

**This brief contains** _____13,994_____ **words,** including _____0_____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** _____/s/ Peter B. Morrison_____ **Date** ___January 8, 2025_____
*(use* "s/[typed name]" *to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                                       *Rev. 12/01/22*