No. 24-6605

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEREMY JAEGER, *et al.*,
*Plaintiffs-Appellees*,

v.

ZILLOW GROUP, INC., *et al.*, *et al.*,
*Defendants-Appellants*.

**On Appeal from the United States District Court for the Western District of Washington at Seattle, Case No. 2:21-cv-01551-TSZ
The Honorable Thomas S. Zilly**

## DEFENDANTS-APPELLANTS' REPLY BRIEF

Peter B. Morrison
*Counsel of Record*
Virginia F. Milstead
Winston P. Hsiao
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
2000 Avenue of the Stars, Suite 200N
Los Angeles, CA 90067
Telephone: (213) 687-5000
peter.morrison@skadden.com

Sean C. Knowles
Zachary E. Davison
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
sknowles@perkinscoie.com

*Attorneys for Defendants-Appellants Zillow Group, Inc., Richard N. Barton, Allen W. Parker, and Jeremy Wacksman*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................................ iv

INTRODUCTION............................................................................................. 1

ARGUMENT ..................................................................................................... 5

I.      Plaintiff Cannot Justify the District Court's Failures to Apply the Correct Legal Standard and Evaluate All Evidence Relevant to Price Impact................. 5

      A.      Plaintiff's Argument That *Goldman*'s Price Impact Inquiry Concerning a Presumption of Reliance Should Be Evaluated Using the Standard for Demonstrating Loss Causation Lacks Merit. ................................................................................................ 5

            1.      Plaintiff's Argument That Loss Causation and Reliance Share the Same Test Is Wrong. ......................................... 6

            2.      Post-*Goldman* Case Law Does Not Support Plaintiff's Claim That the Standards for Assessing Loss Causation and Price Impact in Inflation Maintenance Cases Are the Same. ................ 11

            3.      *Goldman* and *Goldman II* Are Not Limited to Cases Challenging Generic Statements. ...................................... 13

      B.      Plaintiff's Efforts to Justify the District Court's Failure to Evaluate All of Defendants' Price Impact Evidence Lack Merit. ........... 16

II.     Had the District Court Considered All Evidence and Applied the Correct Legal Standard, It Would Have Found a Lack of Price Impact. .......... 19

      A.      None of the Back-End Statements in This Case Actually Corrected Any of the Front-End Statements, as *Goldman* Requires. ...... 20

      B.      Three of the Four Back-End Statements Repeated Already Public Information. ................................................................................ 23

      C.      The Back-End Statements Were Not Value-Relevant.............................. 25

D.    A Good Dose of Common Sense Refutes a Price Impact
Inference.................................................................................................. 27

CONCLUSION ............................................................................................. 28

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS................................. 30

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

### <u>CASES</u>

*Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*,
  77 F.4th 74 (2d Cir. 2023) ................................................ 1, 2, 3, 6, 7, 8, 9,
  ............................................................... 11, 12, 13, 18, 20, 21, 23, 25, 26

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ....................................................................... 2, 7

*In re Concho Resources, Inc. Securities Litigation*,
  No. 4:21-cv-2473,
  2025 WL 1040379 (S.D. Tex. Apr. 7, 2025) ............................ 11, 12, 14, 15

*Connecticut. Retirement Plans & Trust Funds v. Amgen Inc.*,
  660 F.3d 1170 (9th Cir. 2011),
  *aff'd*, 568 U.S. 455 (2013) ............................................................... 24

*DeShaney v. Winnebago County Department of Social Services*,
  489 U.S. 189 (1989) .......................................................................... 22

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ................................................................... 3, 7, 18

*Ferris v. Wynn Resorts Ltd.*,
  No. 2:18-cv-00479-APG-DJA,
  2023 WL 2337364 (D. Nev. Mar. 1, 2023) ...................................... 12

*In re FibroGen Securities Litigation*,
  No. 21-cv-02623-EMCC,
  2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) ......................... 19, 25, 26

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
  594 U.S. 113 (2021) ................................................. 1, 2, 4, 5, 6, 8, 9, 14,
  ..................................................................... 16, 17, 18, 20, 27, 28

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) .......................................................................... 7, 8

*Indiana Public Retirement System v. AAC Holdings, Inc.*,
    No. 3:19-cv-00407,
    2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023) .......................................................... 12

*International Brotherhood of Electrical Workers Local 98 Pension Fund*
    *v. Deloitte & Touche LLP*,
    348 F.R.D. 35 (D.S.C. 2024) ........................................................................................ 13

*Jaeger v. Zillow Group, Inc.*,
    644 F. Supp. 3d 857 (W.D. Wash. 2022) ...................................................................... 23

*In re Kirkland Lake Gold Ltd. Securities Litigation*,
    No. 20-CV-4953 (JPO),
    2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ...................................... 4, 11, 12, 14, 15

*In re Mattel, Inc. Securities Litigation*,
    No. 2:19-cv-10860-MCS-PLA,
    2021 WL 4704578 (C.D. Cal. Oct. 6, 2021) ............................................................ 12, 13

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ........................................................................................... 7

*In re NIO, Inc. Securities Litigation*,
    No. 19-CV-1424 (NGG) (JRC),
    2023 WL 5048615 (E.D.N.Y. Aug. 8, 2023) ............................................................... 12

*Nuveen Municipal High Income Opportunity Fund v. City of Alameda*,
    730 F.3d 1111 (9th Cir. 2013) ................................................................................... 7, 21

*Pardi v. Tricida, Inc.*,
    No. 21-cv-00076-HSG,
    2024 WL 4336627 (N.D. Cal. Sept. 27, 2024) ...................................... 3, 4, 11, 12, 15

*In re Qualcomm Inc. Securities Litigation*,
    No. 17cv121-JO-MSB,
    2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ..................................................23, 24, 25

*Richman v. Goldman Sachs Group, Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012) ............................................................................ 9

*Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*,
    545 F. Supp. 3d 120 (S.D.N.Y. 2021) ...................................................................... 9, 10

v

*Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*,
    No. 18-CV-12084 (VSB) (KHP),
    2024 WL 1497110 (S.D.N.Y. Apr. 5, 2024) ............................................................ 10

## **STATUTES**

15 U.S.C. § 78u-4(b)(4) ............................................................................................... 7

# INTRODUCTION[1]

The district court committed two legal errors, each of which requires reversal of its class certification order. Plaintiff's answering brief does nothing to rescue the order from reversal.

*First*, the court applied the wrong legal standard when evaluating whether Defendants proved that the alleged misstatements did not impact Zillow's stock price and, therefore, rebutted the fraud-on-the-market presumption of reliance. *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System* holds that in inflation maintenance cases, like this one, defendants may demonstrate lack of price impact by showing a "mismatch between the contents of the misrepresentation and the corrective disclosure." 594 U.S. 113, 123 (2021). The district court here did not apply *Goldman*'s mismatch standard. Instead, it wrongly applied the standard for loss causation—an element different than reliance and subject to a different legal standard. *See Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 99 n.11 (2d Cir. 2023) (*Goldman II*).

*Second*, the court expressly refused to consider the extensive evidence relevant to the mismatch analysis Defendants submitted. That failure violated *Goldman*'s instruction to consider "*all* evidence relevant to" the mismatch analysis. 594 U.S. at 122.

Plaintiff spends most of his answering brief (Opp.) arguing that requiring the district court to follow *Goldman* and *Goldman II* would radically change the law and

---

[1] Unless otherwise noted, internal quotations, citations, and alterations are omitted, and emphases are added.

prevent class certification in nearly all securities cases. Opp.-24-34, 55-58. That is not true. Indeed, *Goldman* and *Goldman II* were worried about the *opposite* problem: that not requiring a closer fit between the alleged misstatement on the front-end and the alleged corrective disclosure on the back-end in inflation maintenance cases would proliferate abusive claims. *Goldman II*, 77 F.4th at 99 n.11, 101.

The fraud-on-the-market theory presumes all material public information is incorporated into a stock's price. Thus, investors purchasing stock at its market price presumably relied on any alleged misstatements that artificially inflated that price. *See Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988). Inflation maintenance cases, however, test the logical limits of this presumption. The inflation maintenance theory posits that even when investors challenge a statement that did *not* actually increase the stock's price when made, they can nonetheless enjoy a presumption of reliance simply by identifying a back-end statement followed by a stock price drop, and arguing that the same drop would have occurred earlier if the front-end statement had been truthful. *Goldman*, 594 U.S. at 123. That theory creates a danger that the presumption of reliance will be applied too broadly because the theory allows plaintiffs to claim reliance based on the stock price's *lack of reaction* to a purportedly misleading front-end statement.

The *Goldman* decisions sought to prevent abuse of the inflation maintenance theory. To do so, *Goldman II* held that inferring a price impact in inflation maintenance cases "requires a closer fit (even if not precise) between the front- and back-end statements" than is required to allege loss causation. 77 F.4th at 99 n.11. The Second

Circuit held this was *necessary* to avoid "turning securities claims into a game of litigation-by-hindsight." *Id.* at 101. "Were it otherwise, securities plaintiffs … would need only find negative news … and then point to any previous [front-end statement] from the company which touches upon a similar subject." *Id.* Back-end statements can only support an inference of price impact when they "expressly and specifically negat[e] the alleged false statement" or "directly render[] [it] false." *Id.* at 98.

Plaintiff's remaining arguments to ignore *Goldman* and *Goldman II* and affirm the district court's certification order also lack merit.

*First*, Plaintiff argues that *Goldman* requires only that Plaintiff plead that back-end statements are "corrective disclosures" under the standard for loss causation. Opp.-27-32. That is wrong. The Supreme Court itself has recognized that "loss causation is a … distinct concept in securities law; it is not price impact." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 814 (2011) (*Halliburton I*). The Second Circuit too has stated that price impact addresses "a different question than loss causation." *Goldman II*, 77 F.4th at 99 n.11. Plaintiff thus must meet *Goldman*'s mismatch standard, a more stringent test, not simply plead loss causation.

*Second*, Plaintiff argues that there is a "nationwide" consensus that a plaintiff can satisfy *Goldman*'s mismatch standard by identifying a "corrective disclosure" under a loss causation standard. Opp.-27-30. To the contrary, a majority of lower courts, including decisions Plaintiff cites, have rejected Plaintiff's view and followed the Second Circuit's mismatch standard. *See Pardi v. Tricida, Inc.*, 2024 WL 4336627, at *8 (N.D. Cal. Sept.

27, 2024) ("Avoiding a mismatch requires a closer fit (even if not precise) between the front-and back-end statements than courts have required when analyzing the loss causation element of securities fraud."); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *6 (S.D.N.Y. Mar. 29, 2024).

*Third*, Plaintiff argues that *Goldman*'s mismatch analysis applies only when the front-end alleged misstatements are "generic" and the back-end disclosures are "specific." Opp.-33. Wrong again. *Goldman* applies whenever "there is a mismatch between the *contents* of the misrepresentation and the [back-end] disclosure." *Goldman*, 594 U.S. at 123. Nothing in *Goldman* or *Goldman II* limits those holdings to the specific facts at issue. Rather, courts applying the *Goldman* standards recognize the cases are not so limited. *See Kirkland*, 2024 WL 1342800, at *11 (a mismatch in genericness is "not the only way there could be a mismatch between the two statements").

*Fourth*, Plaintiff's argument regarding the district court's failure to consider all of Defendants' price impact evidence ignores the district court's own order, which expressly declined to consider Defendants' evidence because it "goes to loss causation and the merits." 1-ER-16. Instead, Plaintiff asks this Court to assume without basis that the district court considered all evidence, notwithstanding the district court order's plain language to the contrary, near-total focus on the complaint's allegations, application of a loss causation standard, and failure to meaningfully discuss the nearly 1,000-page evidentiary record. Opp.-53-55. The district court's order makes clear that the court did

not consider "*all* evidence relevant to price impact," as *Goldman* requires. 594 U.S. at 122.

Because the district court failed to (1) apply *Goldman*'s mismatch standard and (2) evaluate all evidence relevant to that standard, the Court should reverse the district court's class certification order. In doing so, the Court should hold that the Second Circuit's mismatch standard articulated in *Goldman II*, as it interpreted *Goldman*, applies in the Ninth Circuit, and that the preponderance of evidence here showed that no price impact occurred, rendering any reliance presumption rebutted. At minimum, the Court should remand for the district court to apply the correct legal standard and consider all Defendants' evidence.

## ARGUMENT

**I.    Plaintiff Cannot Justify the District Court's Failures to Apply the Correct Legal Standard and Evaluate All Evidence Relevant to Price Impact.**

**A.    Plaintiff's Argument That *Goldman*'s Price Impact Inquiry Concerning a Presumption of Reliance Should Be Evaluated Using the Standard for Demonstrating Loss Causation Lacks Merit.**

As shown in the opening brief ("Br."), in inflation maintenance cases, *Goldman* requires courts to assess whether front- and back-end statements are mismatched. Br.-22-24. The purpose of that assessment is to determine whether Plaintiff is entitled to the inference that the amount a stock price dropped following back-end statements can serve as a proxy for the amount the stock price would have dropped earlier had the front-end statements been truthful. *Id.* Statements are mismatched if the back-end

statements do not "expressly and specifically negat[e] the [front-end] statement" or "directly render[] [it] false." *Goldman II*, 77 F.4th at 98. Here, the district court did not assess whether the statements at issue are mismatched under *Goldman*'s standard. Instead, it assessed whether the *back-end statements* "might have affected stock prices" when they were made. 1-ER-16. That is the test for *loss causation*, not the separate element of *reliance* at issue here. Br.-46-52. The district court's failure to apply the correct legal standard in assessing Plaintiff's motion for class certification warrants reversal. Br.-17.

Plaintiff offers several arguments in response. None has merit.

### 1. Plaintiff's Argument That Loss Causation and Reliance Share the Same Test Is Wrong.

Plaintiff first argues the district court was correct to use a *loss causation* standard in deciding whether Defendants rebutted the presumption of *reliance*. *Goldman* held that when front- and back-end statements are mismatched, "it is less likely that the specific disclosure actually corrected the generic misrepresentation." 594 U.S. at 123. Seizing on the word "corrected," while ignoring the rest of *Goldman*, Plaintiff argues that statements are not mismatched when the plaintiff successfully asserts that the back-end statement is a "corrective disclosure" under the loss causation standard. Opp.-27-32.

Plaintiff's argument improperly conflates loss causation and reliance and misunderstands the price impact inquiry in inflation maintenance cases. As the Supreme

Court has recognized, "loss causation is a … distinct concept in securities law; it is not price impact." *Halliburton I*, 563 U.S. at 814; *accord Goldman II*, 77 F.4th at 99 n.11.

"Loss causation" refers to the plaintiff's "burden of proving that the act or omission of the defendant … caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). To show loss causation, a plaintiff attempts to allege that a back-end statement revealed information that was concealed by the fraud, causing the plaintiff's stock to decline in value. *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 754 (9th Cir. 2018). A plaintiff can utilize this approach even if the back-end statement does not expressly reference the front-end statement or affirmatively reveal its falsity. *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013).

By contrast, price impact and the underlying issue of reliance concern a different question: whether in making an investment decision the plaintiff relied on the alleged misstatements when they were made. Under *Basic*, courts presume that the price of a stock trading in an efficient market incorporates all material public information. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) (*Halliburton II*). Thus, courts presume investors who purchase a stock at its market price in an efficient market implicitly relied on the company's public statements that contributed to that price. *Basic*, 485 U.S. at 245.

In a typical case, courts evaluate reliance by examining whether the stock price moved when defendants made the challenged statements. Then, reliance is a front-end

7

inquiry: the presumption of reliance is triggered when the stock price increases following the alleged misstatement without regard to any back-end statement. *See Halliburton II*, 573 U.S. at 280. The inflation maintenance theory, however, allows plaintiffs to enjoy the presumption of reliance even when the alleged misstatement did *not* cause the stock price to move at all. Instead, plaintiffs identify a back-end statement followed by a stock price drop and argue that this back-end price drop would have occurred earlier had the front-end statement been truthful. Thus, under this theory, the back-end price drop functions as a proxy for alleged front-end price inflation.

The *Goldman* decisions held that this proxy approach is sound only when the front- and back-end statements are very similar to one another; otherwise, the theory is rife with potential for abuse. *Goldman* explained that the notion that the back-end statement can function as a proxy for the front-end statement "starts to break down when there is a mismatch between the contents" of the statements. *Goldman*, 594 U.S. at 123. That, in turn, "means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.*

As the Second Circuit held in *Goldman II*, *Goldman*'s price impact analysis therefore "requires a closer fit … between the front- and back-end statements" than is required to allege loss causation. *Goldman II*, 77 F.4th at 99 n.11. The reason is simple. A back-end statement can "constructively disclos[e] the [purported] fraud"—thus satisfying the standard for loss causation—while still being different enough from the front-end statements that there is no "basis to infer that the back-end price equals front-

8

end inflation." *Id.* That does not mean that the statements need to be "mirror-images" of one another. *Contra* Opp.-55-58. But it does mean that the statements have to be close enough in content that the back-end statements "actually correct[]" the alleged misstatements, in order to "infer front-end price inflation—that is, price impact—from the back-end price drop." *Goldman*, 594 U.S. at 123.

A pair of examples illustrates the point. In *Goldman* itself, the plaintiff alleged the defendant made false statements about having sufficient controls to prevent conflicts of interest. 594 U.S. at 116. The plaintiff further alleged the falsity of the front-end statements was revealed by several government investigations involving allegedly undisclosed conflicts of interest, causing the defendant's stock price to decline. *Id.* The district court held the government investigations were plausibly "corrective disclosures" for loss causation purposes because they could be seen as revealing a consequence of the defendant's alleged "pattern of making misstatements" about "its conflicts of interest." *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 282-83 (S.D.N.Y. 2012). But the Second Circuit later held that the same back-end statements could *not* be used to infer price impact under *Goldman* because they did not reference the front-end statements and contained much more detailed information. *See Goldman II*, 77 F.4th at 100.

Similarly, in *Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*, 545 F. Supp. 3d 120, 147 (S.D.N.Y. 2021), the plaintiff alleged the defendant made misstatements about its involvement in a scheme to defraud a foreign investment fund. The district court found

9

that news articles recounting meetings between the defendant's CEO and the individual later accused of running the scheme were plausibly corrective disclosures for loss causation purposes, because the meetings were in tension with front-end statements downplaying the defendant's ties to and knowledge of the scheme. *Id.* But later in the same case, the court found that the same back-end news articles were too mismatched from most of the front-end statements to support an inference of front-end price impact. *See Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 2024 WL 1497110, at *16-17 (S.D.N.Y. Apr. 5, 2024). The court reasoned that the back-end statements regarding the meetings were mismatched with front-end statements that (1) defendant had no visibility into whether monies were being diverted from the investment fund; and (2) the accused fraudster was not a client of defendant's. While recognizing overlapping subject matters between the front-end and back-end statements, the court still found a sufficient mismatch where the revelation of the meeting "d[id] not necessarily render false" the front-end statements; thus, "the *Basic* presumption does not apply as to these [particular front-end] statements." *Id.* at *17.

Plaintiff is thus wrong to argue that, once a plaintiff has alleged a "corrective disclosure" for loss causation purposes, a defendant can never satisfy *Goldman*'s "mismatch" standard sufficient to rebut the presumption of reliance.

### 2. Post-*Goldman* Case Law Does Not Support Plaintiff's Claim That the Standards for Assessing Loss Causation and Price Impact in Inflation Maintenance Cases Are the Same.

Plaintiff argues that there is a "nationwide consensus" supporting his argument that front- and back-end statements cannot be mismatched under *Goldman* when the plaintiff successfully pleads that the back-end statements are "corrective disclosures" under the test for loss causation. Opp.-27-30. Plaintiff is incorrect for two reasons.

*First*, numerous cases have found that front- and back-end statements were mismatched under the *Goldman* standard. *See, e.g.*, *Goldman II*, 77 F.4th at 100 (finding all statements mismatched); *Kirkland*, 2024 WL 1342800, at *6 (same); *Pardi*, 2024 WL 4336627, at *10-11 (finding most statements mismatched); *In re Concho Res., Inc. Sec. Litig.*, 2025 WL 1040379, at *11-17 (S.D. Tex. Apr. 7, 2025) (same). If the *Goldman* analysis merely requires a plaintiff to plead loss causation, there should be virtually no cases finding a mismatch at the class certification stage once the case proceeds past the pleading stage. The fact that many cases have found a mismatch at the class certification stage, notwithstanding that loss causation was pled, is proof that, contrary to Plaintiff's argument, courts have not simply been applying a loss causation standard to conduct *Goldman*'s mismatch analysis.

*Second*, most courts *reject* Plaintiff's argument that the *Goldman* standard is a rehash of the loss causation standard. The Second Circuit squarely refused Plaintiff's argument, holding that *Goldman*'s price impact analysis "requires a closer fit … between the front- and back-end statements" than is required to allege loss causation. *Goldman II*, 77 F.4th

11

at 99 n.11.[2] Multiple district courts—including one in this Circuit—have followed the Second Circuit's reasoning. *See Pardi*, 2024 WL 4336627, at *8 ("Avoiding a 'mismatch' requires a closer fit (even if not precise) between the front-and back-end statements than courts have required when analyzing the loss causation element of securities fraud."); *Kirkland*, 2024 WL 1342800, at *6 (similar); *Concho*, 2025 WL 1040379, at *11 (similar).

Many of Plaintiff's cases say nothing to the contrary. In *Indiana Public Retirement System v. AAC Holdings, Inc.*, 2023 WL 2592134, at *13-14 (M.D. Tenn. Feb. 24, 2023), the court observed that "while price impact and loss causation are related, they are conceptually distinct" and should not be conflated in the price impact analysis. In *In re NIO, Inc. Securities Litigation*, 2023 WL 5048615, at *14-15 (E.D.N.Y. Aug. 8, 2023), the court granted class certification because it found that the front- and back-end statements were closely matched after conducting a separate price impact analysis, not because the plaintiff plausibly pled a corrective disclosure for loss causation purposes.

That leaves three cases to support Plaintiff's "nationwide consensus": *Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364 (D. Nev. Mar. 1, 2023), *In re Mattel, Inc. Securities*

---

[2]     Plaintiff argues *Goldman II*'s discussion of the differences between loss causation and price impact should be disregarded as dictum. Opp.-56. Not so. Had the Second Circuit agreed that the relevant price impact test is whether the Plaintiff had pled loss causation, that would have negated the rest of its explanation of *Goldman*'s mismatch standard. *See Goldman II*, 77 F.4th 97-99 & nn.11-12. Moreover, subsequent courts have not treated this as dictum (discussed below).

*Litigation*, 2021 WL 4704578 (C.D. Cal. Oct. 6, 2021), and *International Brotherhood of Electrical Workers Local 98 Pension Fund v. Deloitte & Touche LLP*, 348 F.R.D. 35 (D.S.C. 2024). The first two were issued before *Goldman II* was decided, and thus lacked the benefit of the Second Circuit's analysis. To the extent they use a loss causation test to conduct *Goldman*'s mismatch inquiry, they are wrongly decided and inconsistent with the weight of authority, including the Second Circuit. The Court should decline to adopt the legal standard from this minority of district court cases. A back-end statement can count as a corrective disclosure for loss causation purposes while still being too mismatched from the front-end statement to support the inflation maintenance inference. *See Goldman II*, 77 F.4th 97-99.

If anything, that these district courts have confused *Goldman*'s mismatch standard with a loss causation analysis only underscores the need for this Court to clarify the test. Thus, the Court should clarify the law by reversing the district court's erroneous decision to grant class certification.

### 3.     *Goldman* and *Goldman II* Are Not Limited to Cases Challenging Generic Statements.

Plaintiff next argues that *Goldman II*'s "searching price impact analysis must be conducted" only when (1) "there is a considerable gap in front-end—back-end genericness"; (2) "the corrective disclosure does not directly refer to the alleged misstatement"; and (3) "the plaintiff claims that a company's generic risk-disclosure was misleading by omission." Opp.-33. Plaintiff argues that *Goldman II* therefore does not

apply here because any mismatch does not arise from front-end generic statements and back-end specific statements.

Plaintiff is wrong. *Goldman* and *Goldman II* provide that the *only* way that a drop in stock price following a back-end disclosure can be a proxy for the amount of front end inflation maintaining the stock is if the information revealed in the back-end statement is a *match* for the information in the front-end alleged misstatement. *Goldman*, 594 U.S. at 123. If there is a mismatch, then the back end-stock price drop cannot serve as a proxy for front end inflation. *Id.* A generic front-end statement paired with a specific back-end statement is *one way* that a mismatch can be demonstrated. *Id.* But nothing in *Goldman* limits its holding to that specific fact pattern. Indeed, *Goldman* held that the inflation maintenance theory is inappropriate "when there is a mismatch between the *contents* of the misrepresentation and the corrective disclosure." *Goldman*, 594 U.S. at 123. A mismatch in "contents" can occur in many ways.

Following *Goldman*, multiple courts (including in cases Plaintiff cites) have noted that a mismatch in genericness is "not the only way there could be a mismatch between the two statements." *See Kirkland*, 2024 WL 1342800, at *11. Instead, defendants can prove a lack of price impact by demonstrating a mismatch in the substance of the statements, even if the front-end statement is not "generic." *See id.*; *Concho*, 2025 WL 1040379, at *11 (a "substantive mismatch" occurs when "the information contained in the Corrective Disclosure did not actually correct the information found in the

14

misrepresentation"); *Pardi*, 2024 WL 4336627, at *8 (recognizing the concept of a "substantive mismatch").

For example, in *Kirkland*, 2024 WL 1342800, at *10, the plaintiff challenged front-end statements setting out certain minimum standards the defendant would attempt to follow in targeting gold mines to acquire. The statements in question had no front-end impact. Instead, the plaintiff pointed to a back-end disclosure announcing that the defendant had acquired a gold mine that did not meet those minimum standards. *Id.* The court found that the statements were equally specific, and thus there was no mismatch on genericness. *Id.* at *11. But the court nevertheless held that the defendants had demonstrated a lack of price impact under *Goldman* because "there [was] a substantive mismatch between" the statements. *Id.* Specifically, because the front-end guidelines were merely aspirational "targets, rather than rigid requirements," the back-end acquisition of a gold mine that did not meet those targets did not directly render the front-end statement false. *Id.* That, in itself, established a "mismatch in content." *Id.* The mismatch was further confirmed by the lack of analyst commentary mentioning the front-end statement, much less linking the front- and back-end statements. *Id.* at *12. Accordingly, the court found that the defendants had rebutted any inference of price impact under *Goldman*.

Similarly, in *Concho*, 2025 WL 1040379, at *17, the plaintiff challenged the defendant's 2018 financial projections, which told investors to expect "more of the same" positive results throughout 2018. The plaintiff argued for an inflation

maintenance inference based on a stock drop following the defendant's back-end announcement of disappointing financial results for the second quarter of 2019. *Id.* The court found that the statements were substantively mismatched because disappointing financial results for the first half of 2019 did "not actually correct" the defendant's front-end statements that it expected positive results in 2018. *Id.*

The district court here should have engaged, but did not engage, in this mismatch analysis consistent with the principles articulated in *Goldman* and *Goldman II*. The court's failure to do so constitutes reversible error. Had the district court engaged in such a mismatch analysis, it would have been compelled to find a substantive mismatch here sufficient to rebut the presumption of reliance.[3]

### B. Plaintiff's Efforts to Justify the District Court's Failure to Evaluate All of Defendants' Price Impact Evidence Lack Merit.

*Goldman* instructs courts to consider "*all* evidence relevant to price impact." 594 U.S. at 122. The district court did not do that. Instead, it ignored Defendants' evidence,

---

[3]  Plaintiff asserts that Defendants "waived" any argument there is a "genericness" mismatch between front- and back-end statements here. Opp.-27. That argument misses the point. *Goldman* applies any time the "contents" of front- and back-end statements are "mismatch[ed]." *Goldman*, 594 U.S. at 123. Defendants have consistently argued to the district court and on appeal that the statements here are mismatched because the back-end statements do not directly falsify the front-end statements. Br.-30-43. Whether the Court labels that a mismatch about "genericness" or "substance" is irrelevant, as the result is the same—Plaintiff cannot use the back-end price drop to infer front-end inflation. Even under Plaintiff's incorrect view, the August 5, 2021 front-end statements, for example, that Zillow made "durable operational improvements" are considerably more generic than the alleged back-end revelation that Zillow was pausing its home buying.

basing its class certification decision almost entirely on its analysis of the allegations in Plaintiff's complaint. Br.-52-57.

In opposition, Plaintiff asserts that the district court reviewed and weighed "all record evidence" in making its class certification decision. Opp.-53-55. The court's order belies Plaintiff's argument. The district court *explicitly refused* to consider Defendants' evidence that the stock price decline after October 17 and 18 was due to factors unrelated to the alleged misstatements, reasoning that Defendants' evidence "goes to loss causation and the merits." 1-ER-16. The order also focused on Plaintiff's complaint to support its analysis, hardly mentioning the extensive class certification record the parties compiled. Br.-52-57. That failure to consider all evidence and focus on Plaintiff's complaint violated *Goldman*, 594 U.S. at 122.

Plaintiff claims that the district court rightly refused to consider Defendants' evidence that analysts attributed Zillow's October 17-18 pause in home buying to factors other than overlays or reduced scope of renovations. Plaintiff claims this evidence is irrelevant because "three analysts identified 'potential algorithm errors' as a reason for the pause," which, Plaintiff argues, means that any evidence that analysts considered other factors as responsible for the pause "could only speak to how much of the stock drop should be attributed to the misstatement—a pure loss causation question." Opp.-53-54 (emphasis omitted). Plaintiff is incorrect. *Goldman* requires a court to consider "all" evidence, and then, after weighing "all" evidence, decide whether the preponderance of that evidence proves the lack of price impact. *Goldman*, 594 U.S.

at 127. *Goldman* does not permit a court to ignore *defendant's* evidence simply because plaintiff claims to have identified *other* evidence he believes supports his position. Moreover, Plaintiff presupposes that any reference to "algorithm errors" is a coded reference to the misstatements at issue and the allegedly omitted information about overlays. But the analysts mentioned neither overlays nor the alleged misstatements. 2-ER-214-216. That analysts may have addressed the same general subject as an alleged misstatement does not mean those statements had a price impact. *Goldman II*, 77 F.4th at 103. Plaintiff cannot pluck isolated sentences from a few analyst reports and then declare all other evidence irrelevant.

Finally, Plaintiff claims that the Court should presume the district court considered all evidence despite its failure to weigh or even mention the vast majority of that evidence in its order. Opp.-54. However, appellate courts evaluate the lower court's written rationale for its decision. They do not presume that the court conducted an analysis different from what it described. *See Halliburton I*, 563 U.S. at 814 (holding that Court "simply [could not] ignore the [lower court's] repeated and explicit references to 'loss causation'" rather than price impact evidence). The district court's order shows that it focused its analysis on whether Plaintiff's complaint alleged loss causation, rather than weighing the parties' price impact evidence. Indeed, the district court expressly disregarded Defendants' evidence because it "goes to loss causation and the merits." 1-ER-16.

## II. Had the District Court Considered All Evidence and Applied the Correct Legal Standard, It Would Have Found a Lack of Price Impact.

Once Plaintiff's confusion over the law is dispelled, the lack of price impact becomes clear. When deciding whether there is a lack of price impact, one court in this Circuit has analyzed whether the back-end statements were "(i) corrective of one or more prior false statements or omissions, (ii) new …, and (iii) value-relevant." *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024).

Notably, Plaintiff concedes the *FibroGen* factors can provide an appropriate analytical framework. Opp.-35. This is an important concession, as the district court did not assess any of these factors in its class certification order. This failure requires reversal and remand, at a minimum.

The Court need not remand, however. Instead, the Court should direct that no class be certified. As Defendants' opening brief explains, Defendants submitted unrebutted evidence showing that the back-end statements here were not corrective, did not disclose new information and were not value-relevant. Br.-30-43. Had the district court analyzed this evidence under *Goldman*'s mismatch standard, it would have concluded Defendants proved a lack of price impact by a preponderance of the evidence. *Id.*

While Plaintiff offers several arguments under the *FibroGen* framework, none has merit.

19

### A. None of the Back-End Statements in This Case Actually Corrected Any of the Front-End Statements, as *Goldman* Requires.

The first *FibroGen* factor is whether the back-end statements corrected the front-end statements. They do not. Therefore, the statements are mismatched.

*Goldman* held that to support an inference of inflation maintenance, a back-end statement must "actually correct[]" the front-end statements. *Goldman*, 594 U.S. at 123. To meet this standard, a back-end disclosure must "expressly and specifically negat[e] the alleged false statement" or "directly render[] [it] false." *Goldman II*, 77 F.4th at 98. The "back-end disclosures' corrective effect upon the affirmative misrepresentations" should be "obvious." *Id.*

None of the back-end statements here correct the front-end statements. Plaintiff alleges Defendants made misstatements about Zillow's pricing algorithms and durable operational improvements on two dates—August 5 and September 13, 2021. He claims these statements were misleading because they did not disclose that (i) Zillow used overlays to increase offer prices; and (ii) Zillow reduced the scope and pay of renovation projects resulting in contractors "deprioritizing" Zillow jobs. 5-ER-964-971. To "correct" those front-end statements, the back-end statements would need to disclose the information Plaintiff alleges was misleadingly omitted—the use of overlays or the reduction in renovations. *Goldman II*, 77 F.4th at 97. But here, none of the back-end statements said anything about overlays or renovation scope. Br.-31-34. That means the

statements are mismatched, which negates any inference of inflation maintenance under *Goldman* and *Goldman II*.

Plaintiff offers two contrary arguments. Neither succeeds.

*First*, Plaintiff argues that the back-end disclosures are "corrective" in a loss causation sense because they allegedly reveal Zillow did not accurately forecast home price appreciation and struggled to timely complete renovations on its homes inventory. Opp.-39-44. Plaintiff argues that these purported revelations cast doubt on Zillow's statements that it improved its pricing models and made durable operational improvements. *Id.* This argument—that the back-end statements revealed the consequences of business risks that were supposedly concealed by the front-end statements—is a specific theory of loss causation called "materialization of the risk." *See Nuveen*, 730 F.3d at 1120 (describing this theory); Opp.-31 n.8 (same). It is not an argument that the back-end statements "expressly and specifically negat[e] the alleged false statement[s]" or "directly rendered [them] false," as *Goldman* requires. *Goldman II*, 77 F.4th at 98-99 & n.11. Plaintiff does not and cannot show that the back-end statements here directly negate the front-end statements, because the back-end statements say nothing about Zillow's use of overlays or reduced scope of renovation work. Thus, Plaintiff's argument does not negate the mismatch between the front- and back-end statements under *Goldman*. Br.-31-34.

*Second*, effectively conceding that back-end statements about pricing homes do not correct the front-end statements, Plaintiff attempts to rewrite his complaint to

minimize the mismatch between them. Opp.-36-39.[4] Rather than pursue certification of the narrow fraud theory the trial court permitted to proceed based on Zillow's alleged failure to disclose price overlays, Plaintiff now seeks to significantly broaden this liability theory to avoid a mismatch. Plaintiff now asserts that Zillow misled the market, not about the use of overlays, specifically, but about Zillow's inability to accurately forecast home price appreciation and price homes, generally. Opp.-36-37.

Plaintiff did not—because he could not—plead this broader theory of fraud, however, because Zillow *consistently disclosed* that it struggled to accurately forecast home price appreciation and value homes. 3ER-302-333. Moreover, analysts commented on Zillow's struggles. *Id.* In fact, on August 5, during the very analyst call where Plaintiff claims Defendants made misstatements, Zillow disclosed that "the biggest" "constraint [to the success of Zillow Offers] is ourselves" and "w[e]'ve got to get better and better at pricing." 3-ER-328. For this reason, Plaintiff deliberately pursued a far narrower claim based on the failure to specifically disclose overlays.

The district court's order partially denying Zillow's motion to dismiss makes clear Plaintiff pled this narrower fraud theory. As the court describes it: "Plaintiff alleges that Defendants' statements about the algorithms and pricing models were false" *because*

---

[4]     Plaintiff cannot use his appellate briefing to assert theories not pled in his complaint. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 n.2 (1989) (declining to consider theory "not pleaded in the complaint").

Zillow was using overlays instead of "the algorithms' price." *Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 871 (W.D. Wash. 2022).

As Plaintiff pled a narrow theory of falsity to survive Zillow's motion to dismiss, the Court should hold Plaintiff to that same theory when evaluating whether a back-end disclosure is sufficiently matched to the alleged misstatement to support an inference of price impact. *Goldman II*, 77 F.4th at 105. Otherwise, Plaintiff would be allowed to "turn[] [this action] into a game of litigation-by-hindsight." *Id.* at 101.

## B. Three of the Four Back-End Statements Repeated Already Public Information.

The second *FibroGen* factor—whether the back-end statements revealed new information relevant to the front-end statements—also shows the lack of price impact. Where back-end statements "only repeated already public information … it is less likely that Defendants' alleged misrepresentations inflated [the] stock price on the front end." *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *13 (S.D. Cal. Mar. 20, 2023).

Here, three of the back-end statements Plaintiff targets repeated already public information concerning the alleged fraud.[5] The first back-end disclosure is the

---

[5]    The fourth back-end statement—an October 17, 2021 Bloomberg article—revealed that Zillow was pausing new home acquisitions, which was new information at the time. However, the Bloomberg article does not support any inference of front-end inflation maintenance for two reasons. First, the statement does not mention overlays or reduced renovation scope, and is thus mismatched with the front-end statements. Br.-33. Second, Dr. Sabry's analysis shows that the market did not attribute Zillow's pause in home acquisitions to overlays or renovation scope, meaning that the pause's announcement was not value-relevant. Br.-39-40.

October 4, 2021, RBC Report. Plaintiff himself runs from this disclosure, conceding it "has no import here," Opp.-9 n.3, because the statement was not followed by a statistically significant stock price decline even though it *disclosed* that Zillow was *overpaying* for homes. Br.-31-34. Thus, the RBC Report undermines any inference of price impact.

The other two back-end statements—the October 31, 2021 KeyBanc analysis, and Zillow's November 2, 2021, earnings announcement—fare no better. Both of those statements simply repeated prior public reports, including the October 4 RBC Report and at least seven others, that Zillow overpaid for homes and failed to accurately predict home prices, rather than revealing any new information related to the front-end statements. Br.-31-34. Because the statements did not reveal new information, the stock drops following those statements, by definition, must have been attributable to something other than whether Zillow overpaid for homes. *See Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1173-74 (9th Cir. 2011). Because the back-end stock drops are not attributable to the revelation of new information related to the front-end statements, there is no basis to infer that the front-end statements prevented those stock drops from occurring earlier. *See Qualcomm*, 2023 WL 2583306, at *13.

Plaintiff argues that the back-end statements revealed new information because they discussed Zillow's decision to exit its iBuying business. Opp.-45-46. That argument only highlights the mismatch problem. Back-end disclosures about Zillow's decision to exit its iBuying business in November 2021 are not probative of whether Zillow's stock

price would have declined on the front-end in August and September of 2021 had Zillow disclosed its use of price overlays and renovation backlog. Thus, such disclosures do not reveal the kind of new information contradicting Defendants' earlier statements that is relevant to price impact. *Qualcomm*, 2023 WL 2583306, at \*13.

### C. The Back-End Statements Were Not Value-Relevant.

The third *FibroGen* factor—whether the new, relevant information in the back-end statements actually caused the defendant's stock price to drop—also proves the lack of price impact. "It is critical that the price drop be attributable to a [back-end] disclosure, because otherwise the 'causal link' between the alleged misrepresentation and the price impact will have been severed." *FibroGen*, 2024 WL 1064665, at \*12. A lack of analyst commentary attributing a back-end price drop to the alleged front-end misstatements is evidence that those front-end statements had no price impact. *Goldman II*, 77 F.4th at 104.

Here, none of the analyst reports surrounding the alleged corrective disclosures attributed Zillow's declining price to use of price overlays or reduced renovations. Br.-38-43. Nor did analysts understand the back-end disclosures as revealing Zillow had previously misrepresented its pricing models or operational improvements. *Id.* Instead, analysts attributed the stock price drops to macro-economic concerns like labor shortages and volatility in the real estate market, along with the fear that these conditions would prompt Zillow to exit the iBuying business. *Id.* Because the stock drops were not attributable to disclosure of information related to the front-end

statements, the back-end disclosures cannot reveal how Zillow's stock would have behaved had the front-end statements contained the information Plaintiff claims was concealed. *Id.*

Plaintiff makes two contrary arguments. Once again, neither succeeds.

*First*, Plaintiff argues the back-end statements were value-relevant because some analysts "link[ed] the disclosures to Zillow's 'potential algorithm errors,' 'labor shortages,' and 'inability to forecast housing prices.'" Opp.-46. Of course, the purported algorithm errors and inability to forecast housing prices were already known to the market. As explained above and in the opening brief, they had already been disclosed in the October 4 RBC report and at least seven additional reports.

Moreover, Plaintiff does not argue that analysts linked the disclosures to the statements at issue. *See Goldman II*, 77 F.4th at 104 (market commentary on the subject of the misstatements was insufficient because analysts did not "expressly []or impliedly refer" to the alleged misstatements). For the back-end disclosures to be probative of price impact, the stock drop following those disclosures must have been linked to Zillow's use of overlays or reduced renovation scope. Otherwise, the stock drop does not provide insight into how Zillow's stock price would have behaved had Zillow disclosed those details when the alleged misstatements were made. *See id.* at 97. Thus, analysts' failure to link the disclosures to overlays and reduced scope of renovations is fatal to Plaintiff's theory of price impact. *See FibroGen*, 2024 WL 1064665, at *12.

*Second*, Plaintiff argues it does not matter that analysts attributed Zillow's stock price drop to macroeconomic factors instead of its use of overlays and decreased renovation work. Opp.-46-47. Plaintiff reasons that Defendants cannot rebut the *Basic* presumption if their alleged misstatements maintained any inflation in Zillow's stock, even if other factors caused the vast majority of the back-end stock price decline. *Id.* However, Defendants must prove a lack of price impact by a preponderance of the evidence; they need not negate any conceivable possibility of price impact unrelated to Plaintiff's theory. *Goldman*, 594 U.S. at 126-27.

Here, Defendants' unrebutted evidence shows that the back-end statements do not correct the front-end statements, reveal new information relevant to Plaintiff's fraud theory, and were not value relevant. On this record, Defendants' front-end statements did not have *any* impact on Zillow's stock price. This is plainly not a case where the evidence shows there was *some* price impact, but there is conflicting evidence about how much impact the front-end statements had.

### D. A Good Dose of Common Sense Refutes a Price Impact Inference.

The Supreme Court held in *Goldman* that a court's price impact analysis must also be aided by a "good dose of common sense." *Goldman*, 594 U.S. at 122.

Here, Plaintiff's core claim is that just a few vague statements—made during a single analyst call and investor conference on a mere two trading days—about strengthening pricing algorithms and achieving durable operational improvements somehow prevented the loss of $11 billion, *half of Zillow's market capitalization.* 2-ER-229-

27

230, 5-ER-898. That more than strains credulity. Particularly so here, when there is an obvious explanation for why Zillow's stock dropped that has nothing to do with dissipating any "fraud" perpetrated by Defendants' front-end statements. Specifically, Zillow's stock price dropped because of fears that Zillow would exit its iBuying business, dashing investor hopes about its profitability. Br.-43-45.

Plaintiff argues the Court should ignore how nonsensical his price impact theory is because Defendants have not established that Zillow's decision to exit the iBuying business, as opposed to revelations of the purported fraud, caused the entire decline in Zillow's stock price. Opp.-47-48. But Dr. Sabry's unrebutted analysis shows that all of Zillow's stock price decline following the back-end statements was due to its decision to end ZO. Br.-38-43.

Moreover, it defies the common sense *Goldman* requires to think Zillow would have lost $11 billion in market capitalization if on August 5 and September 13, 2021, it had used the word "overlay" and said it was completing less renovation work. 594 U.S. at 122; Br.-33-34. The Court should not blind itself to the fantastical nature of Plaintiff's claims when evaluating price impact.

## CONCLUSION

The Court should reverse the district court's class certification order, or at a minimum, vacate the district court's order and remand for the district court to apply the correct legal standard and evaluate all relevant evidence.

DATED:  April 30, 2025                           Respectfully submitted,


                           SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____/s/ Peter B. Morrison_____
                           Peter B. Morrison
                           Attorneys for Defendants-Appellants

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____24-6605_____

I am the attorney or self-represented party.

**This brief contains** __**6,992**_____ **words,** including _____0_____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties.
   [ ] a party or parties are filing a single brief in response to multiple briefs.
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____/s/ Peter B. Morrison_____ **Date** ___April 30, 2025_____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                                    *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2025, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED: April 30, 2025                         Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____/s/ Peter B. Morrison_____
                        Peter B. Morrison
                Attorneys for Defendants-Appellants