**HAGENS BERMAN**

Steve W. Berman    steve@hbsslaw.com

ATTORNEYS AT LAW

**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 SECOND AVENUE, SUITE 2000
SEATTLE, WA 98101

hbsslaw.com

(206) 268-9320 phone    (206) 623-0594 fax

August 5, 2025

<u>**VIA ACMS**</u>

Molly Dwyer, Clerk of Court
Office of the Clerk
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

      Re:    *Jaeger v. Zillow Group, Inc., et al.*, No. 24-6605
             Fed. R. App. P. 28(j) Letter
            <u>Oral argument scheduled for **August 14, 2025**, in Anchorage</u>

Dear Ms. Dwyer:

    We bring to the Court's immediate attention *SDCERA v. Johnson & Johnson*, No. 24-1409, 2025 WL 2176586 (3d Cir. July 30, 2025) (attached as Exhibit A). The Third Circuit's decision, affirming class certification, provides guidance on three key aspects of price impact analysis after the *Goldman Sachs* ruling,[1] each central to the current appeal.

    *First*, the Third Circuit rejected a stringent "mirror image" requirement for corrective disclosures in its "mismatch" analysis. *Id.* at *4. The court found no mismatch where it observed that "each disclosure contained information relating to J&J's alleged misrepresentations." *Id.* The Third Circuit reasoned that, "unlike in *Goldman*, 594 U.S. at 123, there is no mismatch between the subject of the alleged misrepresentation and the content of the disclosures." *Id.* This "subject-matter" test aligns with the nationwide consensus—a corrective disclosure need only reveal facts that belie earlier misrepresentations. This refutes Appellants' attempt to impose an "exceptionally limited gap" test, where the disclosure must "expressly refer to and negate an earlier false statement." *See* AAB at 28-29.

    *Second*, the Third Circuit affirmed that disclosures based on publicly available information can still communicate a "new signal" to the market. *Id.* at *3. It clarified that re-publication of information by a more credible source, dissemination to a broader

---

[1] *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021).

**HAGENS BERMAN**

Molly Dwyer, Clerk of Court
August 5, 2025
Page 2

audience, or expert analysis of scattered information can convey new, value-relevant information. *Id.* This supports Plaintiff-Appellee's argument that the October 31 KeyBanc deep-dive analysis, the November 1 Bloomberg overpayment disclosure, and the November 2, 2021 shutdown of Zillow Offers were "new" despite Zillow's stale information defense. *See* AAB at 45-46.

**Third**, the *J&J* opinion reinforces the defendant's substantial burden "to prove an absolute lack of price impact" by a preponderance of the evidence (*id.* at *4-5), consistent with the District Court's finding in *Jaeger* that Zillow failed to meet. *See* AAB at 49.

Given the parallels in the legal questions and defense strategies, the Third Circuit's well-reasoned *J&J* opinion supports affirming the District Court's class certification order.

          Respectfully submitted,

          /s/ *Steve W. Berman*
          STEVE W. BERMAN

          *Counsel for Plaintiff-Appellee*

cc: Counsel of Record (via ACMS)

# EXHIBIT A

2025 WL 2176586
Only the Westlaw citation is currently available.
**NOT PRECEDENTIAL**
United States Court of Appeals, Third Circuit.

SAN DIEGO COUNTY EMPLOYEES RETIREMENT
ASSOCIATION; FRANK HALL, Individually
and on behalf of all others similarly situated
v.
JOHNSON & JOHNSON; ALEX GORSKY;
JOAN CASALVIERI; TARA GLASGOW;
CAROL GOODRICH, Appellants

No. 24-1409
|
Argued March 11, 2025
|
Filed: July 30, 2025

On Appeal from the United States District Court for the District of New Jersey

(D.C. No. 3:18-cv-01833)

U.S. District Judge: Honorable Zahid N. Quraishi

**Attorneys and Law Firms**

Neil H. Conrad, Robert N. Hochman [*] [ARGUED], Kristen R. Seeger, John M. Skakun, II, Sidley Austin, One S. Dearborn Street, Chicago, IL 60603, Counsel for Appellants

James E. Cecchi, Carella Byrne Cecchi Olstein Brody & Agnello, 5 Becker Farm Road, Roseland, NJ 07068, Joseph D. Daley [ARGUED], Harini Raghupathi, Robbins Gellar Rudman & Dowd, 655 W. Broadway, Suite 1900, San Diego, CA 92101, Counsel for Appellee

Before: SHWARTZ, RESTREPO, and CHUNG, Circuit Judges.

OPINION [*]

SHWARTZ, Circuit Judge.

**\*1** Defendants Johnson & Johnson and several of its individual employees ("J&J") appeal the District Court's order granting Lead Plaintiff San Diego County Employees Retirement Association's motion for class certification. [1] Because the District Court did not err in concluding that common issues predominate as to the reliance element of Plaintiff's securities fraud claim, we will affirm.

I

Plaintiff filed a putative class action against J&J asserting, among other things, violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiff alleges that J&J made false and misleading statements and omissions ("alleged misrepresentations") between February 2013 and October 2018 to conceal from the public and regulators the presence of asbestos in its talc products. [2] The alleged misrepresentations that survived J&J's motion to dismiss include "statements regarding the safety and asbestos[-]free nature of [J&J's] Talc Products" as well as J&J's quality assurance procedures and commitment to safety. A0488.

Plaintiff asserts that these alleged misrepresentations "maintained artificial inflation in the price of J&J securities" that was ultimately "dissipated through a series of partial disclosures of the relevant truth about J&J's talc." A0413. The FAC alleged that six partial disclosures from September 2017 to December 2018, resulted in "statistically significant declines" in J&J's stock price. A0413-14 (FAC ¶ 421). [3]

**\*2** Plaintiff moved for class certification. Before the District Court (and us), the parties dispute only whether common questions of reliance on J&J's alleged misrepresentations predominate over individual questions. The District Court examined the six disclosures that Plaintiff contends partially corrected J&J's alleged misrepresentations and concluded as to each that J&J did not rebut the presumption that Plaintiff relied upon J&J's representations when purchasing the stock because the corrective disclosures and market reaction thereto provided a basis to infer that J&J's alleged misrepresentations impacted the price Plaintiff paid for the stock. As a result, the Court granted the motion and certified a class of all persons who purchased J&J stock between February 22, 2013, and December 13, 2018.

J&J appeals.

II [4]

We begin by setting forth the legal standard for analyzing whether reliance issues predominate for class certification purposes under Federal Rule of Civil Procedure 23 in securities fraud cases, and then apply it to this case.

A

Federal Rule of Civil Procedure 23 sets forth the requirements for a matter to proceed as a class action. The only requirement at issue here is "predominance." Fed. R. Civ. P. 23(b)(3). A plaintiff satisfies the predominance requirement by establishing that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 362 (2011) (citation omitted). A plaintiff meets this requirement if it demonstrates that the elements of the putative class's claim "are capable of proof at trial through evidence that is common to the class rather than individual to its members." Reinig v. RBS Citizens, N.A., 912 F.3d 115, 127 (3d Cir. 2018) (internal quotation marks omitted). We must therefore consider the elements of Plaintiff's securities fraud claim. The elements are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014) ("Halliburton II") (internal quotation marks omitted).

J&J argues that Plaintiff has not established the predominance of common questions as to the reliance element. The "most direct[ ] way to prove reliance is to show that [the plaintiff] was aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation." Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys., 594 U.S. 113, 118 (2021) (internal quotation marks omitted). The Supreme Court, however, has recognized that "requiring proof of direct reliance 'would place an unnecessarily unrealistic evidentiary burden on [a securities fraud] plaintiff who has traded on an impersonal market.' " Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 461 (2013) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)). The Court has thus "held that a plaintiff may ... invoke a rebuttable presumption of reliance based on the fraud-on-the-market theory," which is based on the "fundamental premise ... that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." Goldman, 594 U.S. at 118 (internal quotation marks omitted).

*3 To invoke this presumption, a plaintiff must prove that: "(1) the alleged misrepresentation was publicly known; (2) the misrepresentation was material; (3) the stock traded in an efficient market; and (4) the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." Id. (internal quotation marks omitted). The first three elements "are directed at price impact—whether the alleged misrepresentations affected the market price in the first place." [5] Halliburton II, 573 U.S. at 278 (internal quotation marks omitted).

J&J concedes that Plaintiff satisfies the elements to invoke the presumption of reliance but argues that J&J has rebutted it. A defendant may rebut the presumption at the class certification stage by proving by a preponderance of the evidence that the alleged "misrepresentation had no price impact" at all. Goldman, 594 U.S. at 119 (citing Halliburton II, 573 U.S. at 283).

"[I]n cases proceeding under the inflation-maintenance theory ... price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen without the false statement." Goldman, 594 U.S. at 123 (internal quotation marks omitted). In determining whether the alleged misrepresentation maintained inflation, and thus had price impact, a court asks whether a "truthful substitute" for the alleged misrepresentation would have affected the stock price. Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc., 77 F.4th 74, 100 (2d Cir. 2023) (internal quotation marks omitted). [6] In determining whether a defendant has proven a lack of price impact, courts "should be open to all probative evidence—qualitative as well as quantitative—aided by a good dose of common sense." Goldman, 594 U.S. at 122 (alterations and internal quotation marks omitted).

J&J asserts "there can be no price impact unless an alleged corrective disclosure contains information that is both new and corrective" and that the corrective disclosures identified in Plaintiff's complaint contained information that was already public and thus not new. J&J Br. at 29. We need not decide whether J&J's assertion that a disclosure must be new is correct, because its argument ignores the fact that disclosures based on public information may nevertheless communicate a new signal to the market in certain

situations.[7] For instance, re-publication of information by a more credible source to a broader audience may convey to the market that the information is particularly significant or worthy of monitoring.[8] See Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP, 623 F. Supp. 3d 470, 500-01 (E.D. Pa. 2022). Similarly, a disclosure that compiles and expertly analyzes stray bits of publicly available information can also communicate new, value-relevant information.[9] Relatedly, a disclosure will not "correct" the market price unless it is "conveyed to the public with a degree of intensity and credibility sufficient to counterbalance effectively any misleading information created by the alleged misstatements," Ganino v. Citizens Utils. Co., 228 F.3d 154, 167 (2d Cir. 2000) (internal quotation marks omitted), including statements by a defendant denying the truth of the information in the corrective disclosures, see, e.g., In re Signet Jewelers Ltd. Sec. Litig., No. 16-6728, 2019 WL 3001084, at *16 (S.D.N.Y. July 10, 2019) ("Where, as here, a purported 'disclosure' is accompanied by a corporate denial, it is no 'disclosure' at all, since such a denial is counteractive, misleading, and can cause investors to doubt the contents of the purported disclosure."); cf. Alaska Elec. Pension Fund v. Pharmacia Corp., 554 F.3d 342, 350 (3d Cir. 2009) ("Just as we require investors to act upon public information indicating fraud, so, too, do we allow them to rely upon corporate statements discounting the possibility of malfeasance.").

B

**\*4** Mindful of these principles, we turn to the disclosures. As a threshold matter, we observe that each disclosure contained information relating to J&J's alleged misrepresentations concerning the presence of asbestos in its talc product, its commitment to safety, or its potential asbestos-related liability. Thus, unlike in Goldman, 594 U.S. at 123, there is no mismatch between the subject of the alleged misrepresentation and the content of the disclosures.[10] Therefore, market reaction to the disclosures is capable of shedding light on the price impact of the alleged misrepresentations. See Glickenhouse & Co. v. Household Int'l, Inc., 787 F.3d 408, 415 (7th Cir. 2015); cf. Goldman, 594 U.S. at 123.

Reviewing the District Court's analysis of each disclosure, we conclude that it did not err in rejecting J&J's argument that the disclosures' contents and market reaction thereto prove an absolute lack of price impact. Each disclosure could have communicated new, value-relevant information to investors[11] and was followed by a stock price decline for which there was no other explanation but the disclosure itself.[12]

**\*5** In light of this evidence, the District Court did not clearly err in determining that, for each of the six disclosures, the market reacted negatively to information about J&J's talc-related representations. Because J&J has not offered any other evidence to suggest that its alleged misrepresentations had no price impact, we conclude that J&J has failed to "sever[ ] the link between the alleged misrepresentation and ... the price ... [Plaintiff]" paid for the security, and therefore has failed to rebut the presumption of reliance. Goldman, 594 U.S. at 118 (quoting Basic, 485 U.S. at 248). Accordingly, the District Court did not err in concluding that common issues predominate as to the reliance element of Plaintiff's securities fraud claim.

III

For the forgoing reasons, we will affirm.

CHUNG, Circuit Judge.

In my view, the District Court erred by failing to make the findings necessary to conclude that J&J failed to rebut the Basic presumption of reliance in accordance with the Supreme Court's guidance in Goldman Sachs Grp. Inc. v. Ark. Teacher Retirement Sys., 594 U.S. 113 (2021) and Basic Inc. v. Levinson, 485 U.S. 224 (1988). Specifically, the District Court did not properly determine whether J&J met its "burden of persuasion to prove a lack of price impact by the preponderance of the evidence," Goldman, 594 U.S. at 114, since, for many of the alleged disclosures, the District Court did not assess evidence introduced by J&J showing that the disclosures did not contain newly public information and were not corrective. Because these factual findings were required,[1] but were not made, and because they should not be made in the first instance here, I would vacate and remand to the District Court.

A. The Alleged Misrepresentations

Plaintiffs allege that from the 1970s through the 2010s, J&J and its executives made statements, and otherwise worked to maintain a public fiction, that J&J's talc products were safe and asbestos-free. This fiction allegedly allowed J&J's

stock to trade at a higher price than it would have had the public known the truth about J&J's talc products. Plaintiffs allege that J&J continued that fiction during the class period by making several misrepresentations that "maintained artificial inflation in the price of J&J securities." App. 413. They further assert that this price inflation was eventually "dissipated through a series of partial disclosures of the relevant truth about J&J's talc." App. 413.

Plaintiffs identify two categories of inflation-maintaining misrepresentations: (1) statements that talc is safe and does not contain asbestos ("safety misrepresentations"), and (2) statements that J&J is committed to investing in research and development to improve its talc products ("R&D misrepresentations"). Only the former category of misrepresentations is at issue here. See Oral Arg. Trans. at 41–42 (conceding that the corrective disclosures do not relate to J&J R&D misrepresentations); In re Williams Sec. litigation-WCG Subclass, 558 F.3d 1130, 1140 (10th Cir. 2009) ("To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company.").

 *6  Some of these safety misrepresentations describe J&J's talc products as non-carcinogenic or asbestos-free based upon alleged compliance with FDA regulations, rigorous testing, and careful selection of the mines from which J&J sources its talc. [2] Other safety misrepresentations speak to J&J's belief, in response to ongoing litigation, that its talc products are, and always have been, safe. [3] The first inflation-maintaining safety misrepresentation identified was made on January 7, 2014, while the first R&D misrepresentation was made in February 2013.

B. Demonstrating and Rebutting Reliance Through Price Impact

1. Demonstrating Price Impact Indirectly

Basic established that:

> [A] plaintiff must make the following showings to demonstrate that the presumption of reliance applies in a given case: (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed.

Halliburton II, 573 U.S. at 268. "The first three prerequisites" of Basic's four-part reliance framework demonstrate "price impact" because they speak to "whether the alleged misrepresentations affected the market price in the first place." Id. at 278 (quoting Halliburton I, 563 U.S. at 814).

Price impact is somewhat more difficult to prove for inflation-maintenance-theory plaintiffs because, as the Supreme Court recognized in Goldman, such "[p]laintiffs typically try to prove the amount of inflation indirectly" by: (1) "point[ing] to a negative disclosure about a company and an associated drop in its stock price; [(2)] alleg[ing] that the disclosure corrected an earlier misrepresentation; and then [(3)] claim[ing] that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." [4] Goldman, 594 U.S. at 123 (citations omitted). The amount of such inflation demonstrated by the first two prerequisites is the misrepresentation's "price impact" on a plaintiff's stock purchase price ("original price"). Id. at 123 (quoting Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408, 415 (7th Cir. 2015)) (price impact is "the amount that the stock's price would have fallen 'without the false statement' ").

2. Rebutting Reliance when Price Impact is Demonstrated by the Goldman-Basic Framework

 *7  Defendants seeking to rebut Basic's presumption of reliance may do so by "severing the link between the alleged misrepresentation" and the original price with evidence showing that the alleged misrepresentation had no price impact. Id. at 118 (quoting Basic, 485 U.S. at 248), 123. This is because "[i]n the absence of price impact, Basic's fraud-on-the-market theory and presumption of reliance collapse." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 278 (2014) ("Halliburton II"). If a misrepresentation's effect was not reflected in the original price, "then there is no grounding for any contention that the investor indirectly relied on that misrepresentation through his reliance on the integrity of the market price." Id.

When a plaintiff demonstrates reliance indirectly through the Goldman framework, a defendant can show a lack of price impact and rebut the presumption of reliance by showing: (1) that the disclosure has no newly publicly known information with an associated price drop; or (2) that the disclosure does not relate to and correct a prior misrepresentation. Either showing will "sever the link" between a misrepresentation and the original price because it prevents a finding of price impact and, hence, rebuts reliance.

a. Severing the Link - Correctiveness

One way defendants can "sever[ ] the link" is by demonstrating that a negative disclosure identified by plaintiffs did not "correct[ ] an earlier misrepresentation." Goldman, 594 U.S. at 118, 123. Whether a disclosure corrects an earlier misrepresentation is critical to price impact because correctiveness connects the disclosure to the earlier misrepresentation, allowing a price drop caused by the disclosure to serve as a proxy for the artificial price inflation caused by the prior misrepresentation. See id. at 123; see also Arkansas Tchr., 77 F.4th at 98 ("By expressly and specifically negating the alleged false statement, the truthful substitute for the lie was identified by the corrective disclosure itself."). Without such a connection, however, there is no reason to conclude that the price drop caused by a disclosure reveals anything about the price inflation caused by an earlier misrepresentation. See In re Allstate Corp. Sec. Litig., 966 F.3d 595, 611 (7th Cir. 2020) (quoting Halliburton II, 573 U.S. at 269 ); Arkansas Tchr., 77 F.4th at 102; cf. Goldman, 594 U.S. at 123 (noting that "back-end price drop" is not equal to "front-end inflation"—and therefore, not indicative of price impact—where "there is a mismatch between the [genericness of the] contents of the misrepresentation and the corrective disclosure"). Therefore, when defendants demonstrate, by a preponderance of the evidence, that a disclosure is not corrective of a prior misrepresentation, they can show a lack of price impact, rebutting Basic's presumption of reliance. See Halliburton II, 573 U.S., at.

b. Severing the Link – No Newly Publicly Known Information

A defendant can also "sever the link between the alleged misrepresentation" and the original price by demonstrating that the information communicated by a disclosure is not new. [5] This is because a "negative disclosure about a company" that exclusively contains *old* information cannot correct the price of an earlier misrepresentation since that earlier-disclosed information has already been incorporated into a company's stock price by the efficiency of the market. [6] See MacPhee v. MiMedx Grp., Inc., 73 F.4th 1220, 1243 (11th Cir. 2023) (quoting FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1311 n.28 (11th Cir. 2011)) ("[B]ecause a corrective disclosure must reveal a previously concealed truth, it obviously must disclose new information, and cannot be merely confirmatory."). [7] In other words, the drop in price must be associated with the new information in a disclosure.

**\*8** Plaintiffs here rely on a recognized theory that each disclosure in a series of disclosures can have its own partially corrective effect. Meyer v. Greene, 710 F.3d 1189, 1197 (11th Cir. 2013) ("[A] plaintiff need not rely on a single, complete corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace 'through a series of partial disclosures' ") (quoting Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 261 (5th Cir. 2009)). To the extent that a successive disclosure merely reiterates information from a prior disclosure, however, its associated price drop likewise cannot be a proxy for price impact. See FindWhat Inv. Grp., 658 F.3d at 1311 n.28 (explaining that a corrective disclosure "obviously must disclose new information"); see also Goldman, 594 U.S. at 123 (a stock price reaction to a disclosure of information already in the market is not indicative of "the amount of inflation maintained by the earlier misrepresentation.").

A disclosure is not "new" to the market until it is publicly known. Basic requires that the alleged misrepresentation be "publicly known" to be incorporated into a stock's purchase price by an efficient market. Halliburton II, 573 U.S. at 268. It follows that a corresponding negative disclosure must also be "publicly known" for an efficient market to adjust a stock's price in response. See Schleicher v. Wendt, 618 F.3d 679, 682, 685 (7th Cir. 2010) (in an efficient market, "[w]hen someone makes a false (or true) statement that adds to the supply of available information, that news passes to each investor *through the price of the stock*" because "if information were there, sophisticated traders would use it, [and] prices would adjust" (emphasis added)). This requires that the information disclosed be more than merely publicly *accessible.* See, e.g., Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc., 769 F.3d 313, 318 (5th Cir. 2014) (detailed expert analysis of three years' worth of previously publicly accessible Medicare data published in Wall Street Journal was, itself, new and corrective). Where a defendant

offers evidence that information was accessible, but does not offer evidence that this accessibility led to it being publicly known and thus incorporated into a stock's price by an efficient market, that evidence is insufficient to rebut the presumption of reliance.[8]

In short, a defendant can sever the link reflected by price impact if the defendant demonstrates that a disclosure contains newly publicly known information associated with a price drop.

### C. J&J's Attempt to Rebut the Presumption Was not Adequately Analyzed

#### 1. Findings Missing from the District Court and Majority Opinions

J&J attempted to rebut the presumption of reliance through the two methods described above: (1) arguing that the disclosures were not new,[9] and (2) arguing that the disclosures were not corrective of prior misrepresentations. The District Court largely declined to address either argument squarely and, in fact, repeatedly stated that it would not consider whether J&J's evidence demonstrated that disclosures were not corrective nor resolve whether the disclosures were new.[10]

 *9  In explicitly declining to address correctiveness, the District Court relied on the Northern District of Texas's opinion in Erica P. John Fund, Inc. v. Halliburton Co., 309 F.R.D. 251, 261–62 (N.D. Tex. 2015). In that opinion, applying Halliburton II on remand, the Northern District of Texas noted that correctiveness largely overlapped with "the merits of the allegations" and concluded that it could not consider the issue at the class certification stage due to the Supreme Court's statements in Amgen and Halliburton II. 309 F.R.D. at 261–62. But in Goldman, the Supreme Court instructed that, even when a class certification question "overlaps with" a merits issue, a court may still address the question so long as the court confines itself to resolving only what is necessary to determine whether Rule 23 is satisfied. 594 U.S. 122, n. 2.[11] There, the Supreme Court remanded specifically for consideration of the "overlap[ping]" issue of correctiveness. Id. at 123–24. Accordingly, "[f]ollowing Goldman," courts are now considering questions related to correctiveness at the class certification stage. Ark. Tchr., 77 F.4th at 81.[12] See supra note 7.

For all six disclosures, the District Court held that J&J had failed to rebut Basic's presumption of reliance because (1) Plaintiffs had identified a drop in J&J's stock price after the publication of each disclosure, and (2) J&J provided no evidence showing that the publication of the disclosures had not caused J&J's stock price to drop.[13] The Majority Opinion adopts this reasoning and states that each disclosure "could have communicated new, value-relevant" information to investors and "was followed by a stock price decline for which there was no other explanation but the disclosure itself." Opinion at 10–11. These are essentially findings that each disclosure had "an associated price drop."

But finding that a disclosure had an associated price drop is not conclusive as to either method of rebuttal because, even where a price drop is associated with a disclosure, the disclosure must still be new and corrective to create an inference of a misrepresentation's price impact. This means that to find price impact, or the lack thereof, the District Court must still address both the newness *and* the correctiveness of the disclosure.

 *10  The District Court made no correctiveness findings and only made newness findings as to two disclosures.[14] Absent such findings, it is impossible to determine whether the District Court clearly erred in concluding that J&J failed to show that the disclosures had "price impact," and thus failed to rebut Basic's presumption of reliance.

Take as an example the July 12, 2018 Ingham verdict. J&J tried to rebut the presumption of reliance by offering evidence that the disclosure was neither new nor corrective. As to newness, J&J argued that all of the asbestos and cancer information reflected by the verdict was old, having already been published in news coverage of the trial, and that the only new information released into the market on July 12, 2018 was the verdict itself. As to correctiveness, J&J asserted that the verdict itself was not corrective of any prior misrepresentation because it merely "conveyed ... that the jury accepted the plaintiffs' theory of the case." App. 1071. In contrast, Plaintiffs asserted that the disclosure was new and corrective as it "constitute[d] new fraud-related information" because the "verdict was the first jury trial where the personally injured plaintiffs alleged that asbestos in J&J's talc, rather than the talc itself, caused their ovarian cancer" App. 3921, and countered that trial coverage did not fully disclose the evidence of this at trial. The District Court expressly declined to resolve either newness or correctiveness

and instead found J&J did not meet its burden because it was "not persuaded that the verdict had no impact at all on the stock price." App. 68.

That is just a finding of an associated price drop, though, and does not answer the question of whether J&J rebutted a presumption of reliance because it does not address whether newly publicly known information in the disclosure related to and corrected a prior misrepresentation. If the District Court were to find that there was no new information conveyed by the verdict about asbestos and cancer, then the price reaction it noted would only be associated with the verdict itself. It would follow then that the verdict's associated price drop could only be a proxy for price impact if the verdict related to and were corrective of alleged safety misrepresentations. Therefore, if the District Court were to similarly find that the verdict did not correct any safety misrepresentation but rather corrected, for instance, the market's estimate of J&J's litigation costs based on prior verdicts, [15] then the price drop would reflect no information about any safety misrepresentation's price impact.

*11 Despite the fact that the District Court declined to resolve whether the Ingham verdict made information newly publicly known, the Majority Opinion does. It finds that, "although the evidence adduced and arguments made at trial were technically public, the jury's conclusion expressed in the verdict, i.e., that J&J's products caused harm - would have provided new information." Opinion at 11, n. 11. That might not be clearly erroneous had the District Court made that finding, but it did not. And coming to that conclusion in the first instance would seem to require analysis of record evidence like whether trial coverage disclosed that "J&J's products caused harm" - analysis that I believe is better conducted by the District Court. [16]

2. Why Further Findings are Necessary Even if the District Court Did not Clearly Err in Analyzing the December 14 Disclosure

Out of the six disclosures identified, the December 14, 2018 disclosure offered the most fulsome discussion of J&J's safety misrepresentations, and I agree with the Majority Opinion that the District Court did not err in concluding that it offered new information. [17] Even if I were to ignore the fact that there was no correctiveness analysis and agree with the Majority Opinion that there was price impact, that would not provide grounds for affirmance of the District Court's order. As Plaintiffs conceded at oral argument, even if we conclude that the December 14, 2018 disclosure (the last disclosure identified by Plaintiffs) demonstrated price impact, we (and the District Court) must still assess the other, earlier disclosures to determine the applicable class period. This is because the corrective effect of these previous disclosures is unknown. As an example, assume that the January 30, 2018 disclosure newly corrected all prior safety misrepresentations. The FAC alleges this disclosure was followed by multiple new safety misrepresentations, the earliest of which occurred on February 5, 2018. See App. 364. If all subsequent misrepresentations went uncorrected until December 14, 2018, then the class would run from January 7, 2014 [18] until January 30, 2018, and from February 5, 2018 until December 14, 2018. However, if the new misrepresentation on February 5, 2018, was corrected by a disclosure on February 7, 2018 (both of which are alleged in the FAC), [19] then that would result in a two-day class period in February, followed by a new class period starting on April 12, 2018, the date of the next safety misrepresentation alleged in the FAC.

D. Conclusion

*12 As the Supreme Court explained in Goldman, "a court has an obligation before certifying a class to 'determine that Rule 23 is satisfied, even when that requires inquiry into the merits.' " 594 U.S. at 122 (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 35 (2013)). Here, the District Court's decision granting class certification did not make necessary findings as to whether J&J's evidence demonstrated that each disclosure was not corrective or newly publicly known. For that reason, I would vacate and remand so that the District Court can properly conduct a "searching" price impact analysis as to all of the purported corrective disclosures. Arkansas Tchr., 77 F.4th at 102.

**All Citations**

Not Reported in Fed. Rptr., 2025 WL 2176586

**Footnotes**

| | |
|---|---|
| * | Robert N. Hochman withdrew as counsel on May 30, 2025, prior to the issuance of this opinion. |
| * | This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent. |
| 1 | This Opinion uses "Plaintiff" to refer to the Lead Plaintiff and the other Plaintiffs named in the complaint. |
| 2 | We express no opinion about whether any of J&J's alleged misrepresentations were false or misleading. |
| 3 | The September 27, 2017 disclosure was a press release from the law firm Bernstein Liebhard LLP, which discussed, among other things, documents unsealed in Ingham v. Johnson & Johnson, No. 1522-CC10417 (Mo. Cir. Ct. filed Aug. 20, 2015), a product liability suit against J&J, and announced that the firm was representing women alleging that their ovarian cancer was caused by asbestos in J&J talc products |
| | The January 30, 2018 disclosure was a Law360 article that discussed testimony in Lanzo v. Cyprus Amax Minerals Co., No. L-7385-16 (N.J. Super. Ct. Law Div. filed Dec. 22, 2016), a product liability suit against J&J and affiliates, and a 1975 report in which a former J&J supplier allegedly said it found asbestos in J&J talc products. |
| | The February 5, 2018 disclosure was a Mesothelioma.net blogpost that discussed, among other things, the anticipated release of J&J documents showing the presence of asbestos in J&J talc products and J&J's efforts to conceal this fact from the public. |
| | The February 7, 2018 disclosure was a press release from the law firm Beasley Allen that discussed, among other things, the anticipated production of "never-before-seen documents" from J&J and its talc supplier indicating the presence of asbestos in J&J talc products. A3112. |
| | The July 12, 2018 disclosure was the announcement of a $4.69 billion verdict against J&J in Ingham, the first product liability suit where a jury found that asbestos in J&J talc products caused the plaintiffs' ovarian cancer. |
| | The December 14, 2018 disclosure was a report, consisting of two Reuters articles, that asserted, among other things, that J&J's talc products were "sometimes tainted with carcinogenic asbestos and [ ] J&J kept that information from regulators and the public." A1829. |
| 4 | The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f). |
| | "We review a class certification order for abuse of discretion, which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 358 (3d Cir. 2015). |
| | Our dissenting colleague states that we have resolved factual questions. To be clear, we did not. Rather, we examined the factual record to determine whether the District Court abused its discretion in certifying the class. Id. Although the District Court could have been more fulsome in explaining how the facts led it to certain conclusions, the facts are present and support these conclusions. |
| 5 | Price impact is distinct from loss causation. In assessing price impact, a court asks whether an alleged misrepresentation affected the stock's market price at the time plaintiff purchased it. See Goldman, 594 U.S. at 119. Loss causation concerns whether "the corrected truth of the [defendant's] former falsehoods actually caused the stock price to fall and resulted in the [plaintiff's] losses," not "whether an investor relied on a |

misrepresentation, presumptively or otherwise, when buying or selling a stock." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809, 812 (2011) ("Halliburton I") (internal quotation marks omitted). Loss causation need not be proven at the class certification stage. See, e.g., id. at 812-13.

6    See also, e.g., In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 258 (2d Cir. 2016) ("[O]nce a company chooses to speak, the proper question for purposes of our inquiry into price impact is not what might have happened had a company remained silent, but what would have happened if it had spoken truthfully." (emphasis omitted)).

7    "[P]ublic information is absorbed into a firm's stock price" "quickly and completely," though not simultaneously, "in the period immediately following disclosure." In re Merck & Co., Inc. Sec. Litig., 432 F.3d 261, 269 (3d Cir. 2005) (internal quotation marks and citations omitted).

8    If a corrective disclosure is not fully assimilated into the stock price (for any reason), a re-publication of the same information that is more credible (for any reason) would be capable of influencing a stock price. See, e.g., Ganino v. Citizens Utils. Co., 228 F.3d 154, 167-68 (2d Cir. 2000).

9    See, e.g., Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc., 769 F.3d 313, 323 (5th Cir. 2014) (holding, on a motion to dismiss, that the district court erred in finding as a matter of law that a Wall Street Journal article "based on publicly available Medicare records," was not a corrective disclosure, because (1) "it is plausible that complex [Medicare] data understandable only through expert analysis may not be readily digestible by the marketplace," (2) the raw data was "difficult to obtain," (3) the "analysis required significant professional expertise," and (4) "various independent analysts [ ] characterized the article as 'new news' "); In re Nektar Therapeutics Sec. Litig., 34 F.4th 828, 839-40 (9th Cir. 2022) (recognizing, on a motion to dismiss, that "if the report 'required extensive and tedious research involving the analysis of far-flung bits and pieces of data,' then '[t]he time and effort it took to compile this information make it plausible that the posts provided new information to the market, even though all of the underlying data was publicly available.' " (quoting In re BofI Holding, Inc. Sec. Litig., 977 F.3d 781, 797 (9th Cir. 2020))); Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc., 877 F.3d 687, 697 (6th Cir. 2017) (holding, on a motion to dismiss, that a consulting firm's report that "used publicly available [hospital] admissions data" to conclude that defendant improperly inflated inpatient admissions "quite plausibly came as news to investors").

10    See In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 513 (2d Cir. 2010) ("A misrepresentation is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations." (emphasis and internal quotation marks omitted)).

11    The September 27, 2017 disclosure communicated that information revealed during a then-recent trial spurred active interest in pursuing claims alleging that asbestos in J&J talc caused ovarian cancer. Although articles published days earlier alleged a link between asbestos in J&J talc and ovarian cancer and quoted certain unsealed documents, the September 27 article communicated something new to the marketplace, namely that Bernstein Liebhard viewed the total body of unsealed documents as sufficiently credible and compelling to merit the filing of additional suits making similar claims

The January 30, 2018 disclosure repeated testimony from the Lanzo trial one day earlier concerning a 1975 J&J report that allegedly revealed the presence of asbestos in talc products. Though the trial testimony was public, what happened in one particular courtroom may not have become simultaneously known in the marketplace and it may take more than one day for the information to be incorporated into a stock price. In re DVI, Inc. Sec. Litig., 639 F.3d 623, 635 (3d Cir. 2011) (recognizing that even in an efficient market, information may take two days to be incorporated into the market price), abrogated on other grounds by Amgen, 568 U.S. 455.

The February 5 and February 7, 2018 disclosures discussed the expected revelation of "never-before-seen" documents allegedly indicating J&J's knowledge of asbestos in its talc products. A3112. J&J contends that these disclosures could not have contained new information because their authors described them as sourced from public information. The February 5, 2018 disclosure's "head writer" described it as gleaned in part "from public trials (like Lanzo)," A5193-94, while a principal at the firm that authored the February 7, 2018 disclosure said some of the "documents or information" therein had already "been used in public trials," A5203. These statements, without more, fail to establish that the market had already priced in this information and rendered the February 2018 disclosures stale: a single reference in a prolonged public trial, for example, would be too opaque of a disclosure for the market to understand and price in. J&J therefore gives us no reason to conclude the information contained in the February 2018 disclosures was not new to the market in that it was presented in an intelligible manner for the first time.

The July 12, 2018 disclosure contained new information because (1) although the evidence adduced and arguments made at trial were technically public, the jury's conclusion expressed in the verdict—i.e., that J&J's products caused harm—would have provided new information suggesting the falsity of the alleged misrepresentations Plaintiff identified, and (2) a large jury verdict might provide a new signal to the market about future liability and hence the risks the company faced from the alleged misrepresentations at issue in this suit. See, e.g., In re Omnicom, 597 F.3d at 513 (noting that where misrepresentations conceal a "zone of risk," losses within this zone may be "proximately cause[d]" by the misrepresentations).

The December 14, 2018 disclosure provided new, value-relevant information to the market for multiple reasons. First, it reflected a robust synthesis and analysis of thousands of pages of information obtained from a variety of difficult-to-understand sources, including a J&J-hosted document dump and lengthy public trials. See, e.g., In re Nektar, 34 F.4th at 839-40 (recognizing that "if the report 'required extensive and tedious research involving the analysis of far-flung bits and pieces of data,' then '[t]he time and effort it took to compile this information make it plausible that the posts provided new information to the market, even though all of the underlying data was publicly available' " (quoting In re BofI, 977 F.3d at 797)); see also Amedisys, 769 F.3d at 323 & n.3 (news article synthesizing public information may constitute new information where (1) "it is plausible that complex [Medicare] data understandable only through expert analysis may not be readily digestible by the marketplace," (2) the raw data was "difficult to obtain," (3) its analysis required "significant professional expertise," and (4) "various independent analysts [ ] characterized the [article] as 'new news' "). Second, that the report was published by a major news organization and republished by others provides an additional reason to conclude that it provided a new signal to the marketplace. See Ganino, 228 F.3d at 167 (noting that the "degree of intensity and credibility" associated with an informational disclosure affects its assimilation by the market (internal quotation marks omitted)); Energy Transfer LP, 623 F. Supp. 3d at 500-01.

12  The September 27, 2017 disclosure was followed by a stock price decline that was not statistically significant. However, the absence of a statistically significant decline after the disclosure is not a barrier to a finding that the press release affected the stock price. See, e.g., Bing Li v. Aeterna Zentaris, Inc., 324 F.R.D. 331, 344-45 (D.N.J. 2018), aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc., 775 F. App'x 51 (3d Cir. 2019) (nonprecedential).

The January 30, February 5, and February 7, 2018 disclosures were followed by statistically significant stock price declines and J&J provided no alternative explanation for such market reactions.

The July 12, 2018 disclosure was also followed by a statistically significant stock price decline for which J&J provided no alternative explanation. That the confidence level with which this drop was statistically significant was slightly below 95% is no barrier to finding that the news impacted the stock price. See, e.g., id. (finding that plaintiff's expert's failure to find a post-disclosure price reaction at the 95% confidence level did not preclude court from finding original misrepresentation had a price impact).

The December 14, 2018 disclosure was followed by a nearly 10% stock price drop, which was also statistically significant. See A3741-42, A3956. J&J asserts that the post-disclosure stock price movement was due to factors such as reputational damage and increased litigation risk, and that losses caused by such factors are not chargeable to the alleged fraud. See, e.g., A3754, A4781; J&J Br. at 46-50. This argument fails. Revelation of J&J's alleged fraud would foreseeably result in reputational damage and increased legal exposure for the company.

1   Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc., 11 F.4th 138, 143 (2d Cir. 2021) (remanding for the district court to more thoroughly assess the "nature of Goldman's alleged misrepresentations" because such an assessment "raise[s] fact-intensive issues better evaluated by the district court in the first instance"); Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc., 77 F.4th 74, 93–94 (2d Cir. 2023) (the district court's "rel[iance] on [a] subject-matter match to use the back-end price drop as a proxy for front-end inflation" is a "factual finding" that we review for "clear error.").

2   For example, one of the purported safety misrepresentations identified by Plaintiffs is a January 7, 2014 statement on J&J's "Our Safety & Care Commitment" website explaining, "[f]ew ingredients have demonstrated the same performance, mildness and safety profile as cosmetic talc;" "[o]ur talc is carefully selected, processed and tested to ensure that [it] is asbestos free, as confirmed by regular testing conducted since the 1970s;" and "our confidence in using talc is based on a long history of safe use and more than 30 years of research by independent researchers, scientific review boards and global regulatory authorities." App. 305.

3   In response to lawsuits alleging that J&J's talc products caused mesothelioma and ovarian cancer, J&J and its executives made several public statements defending the safety of its talc. For instance, on February 23, 2016, a J&J spokeswoman asserted, "[w]e sympathize with the plaintiff's family but firmly believe the safety of cosmetic talc is supported by decades of scientific evidence." App. 323 ¶ 295; see also, App. 329 ¶ 302, and App. 340 ¶ 315.

4   Importantly, "the question here—whether there is a basis to infer that the back-end price equals front-end inflation—is a different question than loss causation, and, in light of Goldman, requires a closer fit (even if not precise) between the front- and back-end statements." Arkansas Tchr., 77 F.4th at 99. Specifically, under Goldman, whether a disclosure can be said to have corrected an earlier misrepresentation depends upon, among other things, whether "there is a mismatch between the contents of the misrepresentation and the corrective disclosure." Goldman, 594 U.S. at 123. A mismatch can occur where the corrective disclosure is "highly detailed" but the misrepresentation is "more generic," as well as where the disclosure does not "bear[ ] on the same subject" as the misrepresentation. Arkansas Tchr., 77 F.4th at 102.

5   J&J also offered evidence that some of the disclosures had no "associated drops in its stock price" as another way to sever the link. Goldman, 594 U.S. at 123. The District Court did make these necessary findings, and I agree with the Majority Opinion that its findings were not clearly erroneous. Therefore, I do not address that method of rebuttal here.

6   See generally Majority Opinion at 6. Basic's presumption of reliance is rooted in the efficient market hypothesis, namely, that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." 485 U.S. at 246. "As a result, if the securities in question trade on an efficient market, then the market itself provides the causal connection between a misrepresentation and the price of the stock." In re Allstate, 966 F.3d at 605.

7   Several courts, post Goldman, have read Goldman to require a corrective disclosure to contain *new* information, though non-precedentially. See In re FibroGen Sec. Litig., 2024 WL 1064665, at *12 (N.D. Cal. March 11, 2024); accord Pardi v. Tricida, Inc., No. 21-CV-00076-HSG, 2024 WL 4336627, at *7 (N.D. Cal.

Sept. 27, 2024); In re Qualcomm Inc. Sec. Litig., No. 17CV121-JO-MSB, 2023 WL 2583306, at *13 (S.D. Cal. Mar. 20, 2023); Ferris v. Wynn Resorts Ltd., No. 218CV00479APGDJA, 2023 WL 2337364, at *10 (D. Nev. Mar. 1, 2023); In re Apache Corp. Sec. Litig., No. 4:21-CV-00575, 2024 WL 532315, at *10 (S.D. Tex. Feb. 9, 2024); Ramirez v. Exxon Mobil Corp., No. 3:16-CV-03111-K, 2023 WL 5415315, at *14 (N.D. Tex. Aug. 21, 2023).

8   The Majority Opinion states that it "need not decide whether ... a disclosure must be new" because some forms of old information can still be corrective, such as "a re-publication that more potently conveys information" or an expert analysis of previously publicly accessible information. Opinion at 8. I believe these examples speak more to situations where information may not be publicly known. Halliburton II, 573 U.S. at 277–278 (under Basic, information that is not "publicly known" cannot affect the stock's market price). I disagree with the Majority Opinion that recognition that a disclosure must be publicly known means that disclosures might not have to be new. Instead, I would say that a disclosure is not "new" to the market until it is publicly known.

9   As noted above, J&J also offered evidence that some of the disclosures had no "associated drops" in price as another way to sever the link, and I agree with the Majority Opinion that the District Court's findings were not clearly erroneous.

10  See, e.g., App. 67 (explaining, for the February 5 and February 7, 2018 disclosures, that "the Court need not determine whether the disclosures are corrective at this stage"); App. 68 (holding, for the July 12, 2018 Ingham verdict, "[t]hough the parties dispute whether the verdict constitutes a corrective disclosure, the Court declines to resolve that dispute on this motion for class certification."); App. 65–66 (holding, for the January 30, 2018 disclosure, that "[n]otwithstanding the parties' dispute over" whether specific information in the disclosure was new, "the Court nevertheless concludes that Defendants cannot show that the [disclosure] had no impact to J&J stock price" because "[h]ere the analysis turns on whether Defendants can 'sever the link' between the statement and the stock price by a preponderance of the evidence and not how [new] the information was" in a disclosure); App. 67 (noting Defendants' position that the July 12, 2018 verdict contained no new information, and Plaintiff's argument that "the Ingham verdict was the first trial containing allegations that the asbestos in talc caused ovarian cancer," and then declining to weigh in and instead holding, "[t]he Court is not persuaded that the verdict had no impact at all on the stock price.").

11  Quoting Allstate, 966 F.3d at 608) (recognizing that "materiality and price impact are overlapping concepts" but noting, "a district court may not use the overlap to refuse to consider the evidence" and "the district court must use the evidence to decide the price impact issue, while resisting the temptation to draw what may be obvious inferences for the closely related issues that must be left for the merits, including materiality.")

12  Basic's second prerequisite, materiality, is an element of securities fraud and is not properly considered at the class certification stage. Halliburton I, 563 U.S. at 810. In contrast, correctiveness is not a merits question. Considering correctiveness, though, will likely require a district court to analyze evidence that is highly relevant to, and overlaps with evidence of, materiality. Ark. Tchr., 77 F.4th at 81 (noting that correctiveness evidence "is often also highly relevant to the closely related merits question of whether the misrepresentation would have been material to a shareholder's investment calculus—which, under other Supreme Court guidance, a court may not resolve at class certification.").

13  The District Court found that Defendants failed to "sever the link" because they "ha[d] not identified another explanation for the price decline." App. 65 (regarding September 27, 2017 disclosure); see also App. 67 (same, regarding February 5 and 7 disclosures); App. 68 (noting price drop following the July 12, 2018 disclosure and stating that the disclosure "does not preclude a finding that the announcement of the verdict itself would not affect J&J's stock price"); App. 68–69 (holding, for the December 14, 2018 disclosure, that "Defendants' various arguments as to why the disclosure does not contain any new information may make

it less likely that the disclosure impacted the stock price, but the Court finds that it does not suffice to rebut the presumption of price impact by a preponderance of the evidence.").

14     See supra note 11 (noting the District Court's failure to assess correctiveness as to the February 5 and February 7, 2018 disclosures, and July 12, 2018 disclosures); see also App. 62 (declining to address whether the September 27, 2017 press release stating that "thousands of ovarian cancer plaintiffs planned to include asbestos allegations in their cases against J&J" was corrective of alleged J&J misrepresentations that talc was safe and asbestos free); App. 69 (same for December 14, 2018 *Reuters* article's analysis); App. 66 (same for the January 30, 2018 Law360 article's reference to a 1975 report).

15     See, e.g., App. 258 (FAC citing August 2017 verdict of $417 million in talc ovarian cancer), App. 266 (FAC citing said verdict was "thrown out").

16     The Majority Opinion leaves unresolved other factual questions that are necessary for evaluating J&J's attempt to rebut price impact. See e.g., App. 66 (as to January 30, 2018 disclosure, District Court declining to resolve party dispute regarding newness because its finding of price reaction did not "turn[ ] on ... how public or widely disseminated the information was"); Opinion at 10, 10 n. 11 (disclosure "could have communicated new, value-relevant information to investors" because "what happened in one particular courtroom may not have become simultaneously known in the marketplace.").

17     I am skeptical of J&J's argument that some of the corrective disclosures contained in the article are not "new" because they were based on sources that were publicly accessible. Op. Br. 3 (citing App. 5087). It is true that these sources were publicly accessible; however, they were buried in document dumps hosted on hard-to-navigate websites, see, e.g. asbestosandtalc.com; factsabouttalc.com. J&J did not offer evidence that, simply by being accessible on the websites prior to Plaintiffs' disclosures, the relatively few relevant documents buried therein were "publicly known."

18     This highlights the problem with the District Court's opinion. Despite the fact that the first safety misrepresentation was not alleged to have been made until January 7, 2014, the District Court certified a class period beginning on February 22, 2013, a day on which an R&D misrepresentation was alleged to have been made. As noted above, Plaintiffs conceded that no corrective disclosure related to an R&D misrepresentation. See Oral Arg. Trans. at 41–42.

19     The need for District Court findings is particularly salient here as part of the February 5, 2018 safety misrepresentation, is nearly identical to part of the content of a September 14, 2017 safety misrepresentation, and the rest *is identical* to a September 21, 2017 safety misrepresentation. If the September 2017 misrepresentations had already been corrected on January 31, 2018, did reasserting them on February 5, 2018 wholly cancel any corrective effect? Compare MacPhee, 73 F.4th at 1242 (subsequent corrective disclosure corrects subsequent *new* misrepresentation). And if there was both a misrepresentation *and* a corrective disclosure on February 5, 2018, as the FAC alleges, and as the Majority Opinion finds, what part of the February 5, 2018 misrepresentation had not been corrected such that it was further corrected on February 7, 2018? That is the date of another corrective disclosure asserted by the FAC, and found by the Majority Opinion. Finally, as some of these misrepresentations are J&J's public statements regarding its litigation position, is J&J foreclosed from ever restating its position publicly when it is taking that position in pending or future cases?